

2006 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

2-3-2006

# Mercy Home Health v. Secretary HHS

Precedential or Non-Precedential: Precedential

Docket No. 05-2082

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2006

Recommended Citation

"Mercy Home Health v. Secretary HHS" (2006). *2006 Decisions.* Paper 1520.
http://digitalcommons.law.villanova.edu/thirdcircuit_2006/1520

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 2006 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 05-2082
_____

MERCY HOME HEALTH,

Appellant

v.

*MICHAEL O. LEAVITT,
SECRETARY OF HEALTH AND HUMAN SERVICES

*(Substituted Pursuant to F.R.A.P. 43(c))
_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. Civ. No. 03-06860)
Honorable Juan R. Sanchez, District Judge
_____

Argued December 7, 2005

BEFORE:  RENDELL, FISHER, and GREENBERG, Circuit Judges

(Filed: February 3, 2006)
_____

Mark H. Gallant (argued)
Kimberly A. Hynes
Cozen & O'Connor
1900 Market Street
4th Floor
Philadelphia, PA 19103

    Attorneys for Appellant

Patrick L. Meehan
United States Attorney
Virginia A. Gibson

Assistant United States Attorney
Chief, Civil Division
Annetta F. Givhan
Office of the United States Attorney
615 Chestnut Street
Suite 1250
Philadelphia, PA 19106

Jan M. Lundelius (argued)
Department of Health & Human Services
Office of the General Counsel
150 South Independence Mall West
The Public Ledger Building
Suite 418
Philadelphia, PA 19106

    <u>Attorneys for Appellee</u>

---

## OPINION OF THE COURT

---

GREENBERG, <u>Circuit</u> <u>Judge</u>.

## I.    INTRODUCTION

This matter comes on before this Court on an appeal by Mercy Home Health ("MHH") from an order of the district court entered March 18, 2005, granting summary judgment in favor of the Secretary of Health and Human Services (the "Secretary"). MHH sought review in the district court of the Secretary's final decision denying certain Medicare reimbursements for home office costs that MHH claimed pursuant to an alternative cost allocation method previously approved by the Medicare fiscal intermediary. For the reasons set forth below, we will affirm.

## II.    FACTUAL AND PROCEDURAL HISTORY

### A.  Medicare Reimbursement

Under Title XVII of the Social Security Act (the "Medicare Act"), 42 U.S.C. § 1395 <u>et</u> <u>seq.</u>, the Secretary administers the

2

Medicare program through the Centers for Medicare and Medicaid Services ("CMS").[1] Most Medicare providers receive reimbursement through fiscal intermediaries ("intermediaries") for services provided to Medicare beneficiaries. Intermediaries contract with the Secretary to determine the amounts due and are bound by the Secretary's regulations and interpretive rules. See 42 U.S.C. §§ 1395h, 1395kk-1; 42 C.F.R. § 421.100.

Congress authorized the Secretary "to promulgate regulations 'establishing the method or methods to be used' for determining reasonable costs." Shalala v. Guernsey Mem'l Hosp., 514 U.S. 87, 91-92, 115 S.Ct. 1232, 1235 (1995) (citing 42 U.S.C. § 1395x(v)(1)(A)). The Secretary's implementing regulations define "reasonable cost" as including reimbursement of only "necessary and proper" costs for furnishing covered services related to beneficiary care. 42 C.F.R. § 413.9(a). During the time period at issue, Medicare reimbursed home health agencies based on their "cost actually incurred," less any costs "unnecessary in the efficient delivery of needed health services." 42 U.S.C. § 1395x(v)(1)(A).

1. Prohibition on Cross-Subsidization

The Medicare Act requires the Secretary's regulations to "take into account both direct and indirect costs of providers of services," and to ensure that Medicare does not pay costs of non-Medicare patients, and that other insurance programs do not pay the costs of Medicare patients. Id. To prevent cross-subsidization, the act further directs the Secretary to "provide for the making of suitable retroactive corrective adjustments where . . . the aggregate reimbursement produced by the methods of determining costs proves to be either inadequate or excessive." Id.

2. Record Keeping Requirements

Because the Secretary must verify the provider's actual costs to ensure proper payment, "[i]t is hardly surprising that the reimbursement process begins with certain record keeping requirements." Guernsey Mem'l Hosp., 514 U.S. at 94, 115 S.Ct. at 1236. To this end, the Medicare Act provides that "no such payments shall be made to any provider unless it has furnished such information

_____

[1]CMS formerly was known as the Health Care Financing Administration ("HCFA").

3

as the Secretary may request in order to determine the amounts due such provider" for the cost period at issue. 42 U.S.C. § 1395g(a). The implementing regulations further state that "[p]roviders receiving payment on the basis of reimbursable cost must provide adequate cost data." 42 C.F.R. § 413.24(a). According to the regulations, the data must be "accurate and in sufficient detail to accomplish the purposes for which it was intended," and the data must be auditable. Id. at § 413.24(c).

### 3. Cost Allocation

The home office of a chain of commonly-owned health care providers is not a Medicare provider and cannot directly receive Medicare reimbursement. See 42 U.S.C. § 1395cc. Nevertheless, inasmuch as home offices may perform certain centralized services for a provider subsidiary, Medicare treats those support services as though "obtained from [the provider] itself." 42 C.F.R. § 413.17(c)(2). The Secretary's interpretive rules, found in the Provider Reimbursement Manual, CMS Pub. 15-1 ("PRM"), address how a provider may obtain reimbursement for home office support functions.

To obtain reimbursement for home office support functions related to the care of Medicare patients, the provider's home office files a cost statement, which identifies the allowable home office costs and how they are allocated among each of its subsidiary companies (also called "components"). See PRM § 2150.3. First, the home office totals all of its own costs, including those that it incurred on behalf of its subsidiary companies, and deletes from that total all unallowable costs. See id. at § 2150.3(A). Second, the home office uses "direct allocation" to allocate as many of its costs as possible. Direct allocation accounts for home office costs that are for the benefit of, or directly attributable to, its Medicare subsidiary or its other subsidiaries. See id. at § 2150.3(B). Third, the home office must allocate as many of the remaining costs as possible on a "functional basis." See id. at § 2150.3(C).

After the home office allocates as many home office costs as possible to its subsidiaries by direct and functional allocation, a "pool" of allowable costs for general management or administrative services remains ("pooled costs"). See id. at § 2150.3(D). If the chain consists of companies providing health care services and other types of companies, all the companies "share in the pooled home office costs in the same proportion that the total costs of each

4

component (excluding home office costs) bear to the total costs of all components in the chain." Id. at § 2150.3(D)(2)(b). Thus, the CMS-prescribed default methodology for allocating pooled costs is a cost-to-total cost allocation methodology.

If a home office has higher costs for one of its non-Medicare providers, but performs few services for that company, the home office may use a more sophisticated alternative allocation method to allocate the pooled costs more precisely. See id. at § 2150.3(D)(2)(b). The PRM specifies the procedure the home office should follow if it wants to use an alternative allocation method:

> If evidence indicates that the use of a more sophisticated allocation basis would provide a more precise allocation of pooled home office costs to the chain components, such basis can be used in lieu of allocating on the basis of either inpatient days or total costs. However, intermediary approval must be obtained before any substitute basis can be used. The home office must make a written request with its justification to the intermediary responsible for auditing the home office cost for approval of the change . . . .

> Where the intermediary approves the home office request, the change must be applied to the accounting period for which the request was made, and to all subsequent home office accounting periods, unless the intermediary approves a subsequent change for the home office.

Id.

### 4. Cost Reconciliation and Review

The Medicare Act requires payments to providers, at least monthly, based on estimated costs. See 42 U.S.C. § 1395g(a). The act also requires the Secretary to establish a process to reconcile estimated payments made with the actual amount due and requires that regulations create a reconciliation process. See id. at § 1395x(v)(1)(A).

The provider initiates the cost reconciliation process by filing an annual cost report with the intermediary. See 42 C.F.R. §

5

413.20(b). The intermediary audits the cost report, see id. at § 421.100(c), and issues a notice of program reimbursement ("NPR"), which informs the provider of the amount of reimbursement due for Medicare services during that fiscal year, id. at § 405.1803. The intermediary then adjusts ongoing payments to account for overpayments or underpayments. See 42 U.S.C. § 1395g(a). To further ensure that intermediaries correctly reimburse Medicare providers, the Secretary's regulations allow intermediaries to reopen cost determinations within three years of the date of the NPR. See 42 C.F.R. § 405.1885(a). Intermediaries must reopen a determination if CMS notifies them that an NPR is inconsistent with applicable law, regulations, or CMS general instructions. See id. at § 405.1885(b)(1)(i); see also PRM § 2931.2.

If the provider is dissatisfied with the intermediary's determination and meets the amount in controversy requirement, the provider may appeal to the Secretary's Provider Reimbursement Review Board ("PRRB"). See 42 U.S.C. § 1395oo(a); 42 C.F.R. § 405.1835; see also 42 C.F.R. § 405.1889 (providing that intermediary determinations after reopening are subject to appeal). The PRRB may hold a hearing and issue a decision that is subject to further review by the Secretary's delegate, the CMS Administrator. See 42 U.S.C. § 1395oo(f)(1); 42 C.F.R. § 405.1875. The CMS Administrator may decline to review or may, affirm, reverse, modify or remand a PRRB decision. See 42 C.F.R. § 405.1875(d)(2), (g)(1). The final decision of the Secretary (issued by the PRRB or the CMS Administrator), is subject to judicial review. See 42 U.S.C. § 1395oo(f)(1).

B. Factual Background

MHH is Mercy Home Health Services' (the "Home Office") only Medicare provider subsidiary.[2] On July 12, 1993, the Home Office sent a letter to its fiscal intermediary, Independence Blue Cross, requesting permission to use an alternative allocation method for the pooled home office costs of its various chain components. The letter stated, "[s]ince the majority of our business is service oriented, the costs in the [H]ome [O]ffice should be largely allocated to those

_____

[2]During the period at issue, the Home Office had four subsidiaries: (1) MHH, the sole Medicare provider; (2) a private duty home nursing agency; (3) a home health care staffing agency; and (4) a durable medical equipment supplier.

6

subsidiaries with high personnel costs, [such as MHH]."[3]  App. at 32. The Home Office claimed in a letter dated November 15, 1993, that there would be a distorted allocation to its durable medical equipment subsidiary under the CMS-prescribed default method due to that subsidiary's high cost of goods sold.

On August 4, 1993, Independence Blue Cross responded by letter requesting "additional information," including a more detailed justification for the change.  App. at 33-34.  Independence Blue Cross indicated that it would make a final determination after reviewing the additional information and noted that "all methodologies that we approve are subject to verification during audit."  Id. at 34.  In response the Home Office provided a more detailed description of its proposed alternative allocation method and referred Independence Blue Cross to other data it previously had supplied in connection with quarterly reports.  Specifically, the Home Office explained that it believed an allocation of costs to all subsidiaries on a cost-to-total cost basis (the CMS-prescribed default method) would result in an inappropriately large allocation of Home Office costs to its durable medical equipment subsidiary.[4]  On February 11, 1994, Independence Blue Cross approved the request.

---

[3]Liberty Health System, later renamed Mercy Home Health Services after Mercy Health System acquired Liberty in 1995, sent the letter, but we refer to the parent company of MHH, now Mercy Home Health Services, as the Home Office and to the provider component as MHH.

[4]Specifically, the letter stated, in part:

> In July of 1993, [the Home Office] purchased a [durable medical equipment] company.  The nature of this business's expenses are highly weighted towards Cost of Goods Sold and Depreciation.  Under our current cost to cost allocation methodology, home office cost would be unfairly allocated based on total costs of each subsidiary.  This would then include [the Cost of Goods Sold and Depreciation for the durable medical equipment subsidiary,] for which the home office provides little support.

App. at 35.

The Home Office used this alternative allocation method through fiscal year 1996. On June 26, 1996, Independence Blue Cross, without elaborating on the basis for its decision, notified the Home Office that as of January 1, 1997, it no longer would accept the Home Office's alternative cost allocation method. In response, MHH unilaterally implemented a second alternative allocation method, effective January 1, 1997, but Independence Blue Cross never approved this method.

In 1997, Independence Blue Cross voluntarily terminated its contract as a Medicare fiscal intermediary.[5] By notice dated September 30, 1998, the successor intermediary reopened and adjusted MHH's and the Home Office's cost reports for fiscal year 1995 to substitute the CMS-prescribed default method for the first alternative method approved by Independence Blue Cross. This adjustment decreased MHH's allowable costs by $272,000. The successor intermediary similarly reopened and adjusted the cost reports for fiscal year 1996, reducing Medicare reimbursement by $495,868. The successor intermediary also adjusted all costs reports for 1997-1999 based on the default method, thereby rejecting MHH's second alternative allocation methodology, which MHH had adopted unilaterally.

C. Procedural History

1. Decision of the PRRB

MHH separately appealed to the PRRB from the successor intermediary's adjustments to fiscal years 1995-1996 and 1997-1999. After a consolidated hearing, the PRRB reversed the disallowance for fiscal years 1995-1996 but affirmed the disallowance arising out of MHH's unapproved use of the second alternative allocation method during fiscal years 1997-1999. In reversing the disallowance for fiscal years 1995-1996, the PRRB held that MHH's reliance on the intermediary's written instruction should be protected even if the successor intermediary subsequently changes its position.

---

[5]Wellmark, Inc. succeeded Independence Blue Cross as the fiscal intermediary on August 4, 1997, and Cahaba Government Benefit Administrators succeeded Wellmark on June 1, 2000. Because the events at issue include actions taken by both Wellmark and Cahaba, we will refer to them singularly as the "successor intermediary" to Independence Blue Cross.

2.  Decision of the Secretary

The parties sought review of the PRRB decision by the Acting Deputy Administrator ("Administrator") of the CMS, who granted review and partially reversed by reinstating the successor intermediary's adjustments to fiscal years 1995-1996.[6]  The Administrator concluded that the first alternative allocation method used in 1995-1996 was similar to and based on the same rationale as the second alternative allocation method that the PRRB examined and disapproved for use in 1997-1999.  Upon a review of the entire record, the Administrator determined that MHH "failed to demonstrate that the prior approved methodology for allocating [1995-1996] home office costs is, in fact, a more accurate and sophisticated method."  App. at 29.

Notably, the Administrator rejected MHH's reliance argument:

> The Administrator does not agree that the methodology for the FYs 1995 and 1996 can be allowed only on the basis that it was approved by the prior intermediary.  This basis for such an allowance ignores the dictates of the Medicare program set forth in § 1861(v)(1)(A) of the Act and elevates the PRM prior approval provisions above the requirements of the statute.  A general principle under Medicare set forth at § 1861(v)(1)(A) of the Act is that to be reimbursable, the cost must be related to patient care and that Medicare shall not pay for costs incurred by non-Medicare beneficiaries, and vice-versa, that is, Medicare prohibits cross-subsidization of costs.  Moreover, the documentation requirements of the statute and the regulation places the burden of demonstrating that costs are to be paid by Medicare on the provider.

App. at 28-29.  The Administrator reiterated that "regardless of the prior approval (which is subject to audit)," the successor intermediary properly disallowed MHH's cost allocation methodology because MHH "failed to articulate a valid rationale" supporting its methodology.  App. at 29.  Above all, the Administrator stressed that

---

[6]The Deputy Administrator signed the Secretary's final decision, but we will refer to the "Administrator" as having made the decision.

prior approval, or the lack thereof, cannot negate "the Medicare cost principle prohibiting cost shifting."  App. at 29.

### 3. Decision of the District Court

MHH sought review of the Secretary's final decision in the district court.  The parties filed cross-motions for summary judgment, and the district court denied MHH's motion and granted summary judgment in favor of the Secretary.  The district court based its decision primarily on 42 C.F.R. § 405.1885(b)(1), which follows the congressional directive of 42 U.S.C. § 1395x(v)(1)(A) to provide for retroactive corrective adjustments of prior costs reports, even after a provider has submitted its fiscal and statistical reports.  The court rejected MHH's claim that it reasonably relied on the intermediary's prior approval of its cost allocation methodology, and the court concluded that the Administrator's rejection of the alternative allocation methodology for fiscal years 1995-1996 was supported by substantial evidence.  On April 6, 2005, MHH timely filed its notice of appeal.

### III.    JURISDICTION AND STANDARDS OF REVIEW

The district court exercised jurisdiction pursuant to 42 U.S.C. § 1395oo(f)(1), and we have jurisdiction under 28 U.S.C. § 1291 over MHH's appeal.  We can set aside the Administrator's decision only if it is "unsupported by substantial evidence," is "arbitrary, capricious, an abuse of discretion, or [is] otherwise not in accordance with law." 5 U.S.C. § 706(2)(A), (E); see also 42 U.S.C. § 1395oo(f)(1) (providing that judicial review of reimbursement decisions shall be made under the Administrative Procedures Act, 5 U.S.C. § 706). Because we apply the same standard of review as the district court, we will proceed de novo with respect to our review of the district court disposition.  See Mercy Catholic Med. Ctr. v. Thompson, 380 F.3d 142, 151 (3d Cir. 2004); see also Robert Wood Johnson Univ. Hosp. v. Thompson, 297 F.3d 273, 280 (3d Cir. 2002).

The decision of the agency is entitled to deference as articulated in Chevron U.S.A. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 842-43, 104 S.Ct. 2778, 2781-82 (1984).  See Robert Wood Johnson Hosp., 297 F.3d at 281.  Under Chevron, we first must determine if Congress has spoken directly to the question at issue, and if Congress' intent is clear, our inquiry ends as we "must

give effect to the unambiguously expressed intent of Congress." Chevron, 467 U.S. at 843, 104 S.Ct. at 2781. If we decide that Congress has not spoken directly to the issue and "the statute is silent or ambiguous with respect to the specific issue," we must ask whether the agency's interpretation is based on a "permissible construction of the statute." Id. If we find that it is, we afford deference to that interpretation. Id. If Congress "explicitly left a gap for an agency to fill . . . a court may not substitute its own construction of a statutory provision for a reasonable interpretation made by the administrator of an agency." Id. at 843-44, 104 S.Ct. at 2782.

It is well settled that a court must afford substantial deference to an agency's interpretation of its own regulations. Thomas Jefferson Univ. Hosp. v. Shalala, 512 U.S. 504, 512, 114 S.Ct. 2381, 2386 (1994). This broad deference is particularly appropriate in contexts that involve a "complex and highly technical regulatory program, such as Medicare, which requires significant expertise and entail[s] the exercise of judgment grounded in policy concerns." Id. (citation and internal quotation marks omitted); see also Wisconsin Dept. of Health and Family Serv. v. Blumer, 534 U.S. 473, 497, 122 S.Ct. 962, 976-77 (2002). Thus, a court does not have the "task . . . to decide which among several competing interpretations best serves the regulatory purpose." Thomas Jefferson Univ. Hosp., 512 U.S. at 512, 114 S.Ct. at 2386. Instead, "the agency's interpretation must be given controlling weight unless it is plainly erroneous or inconsistent with the regulation." Id.

## IV.  DISCUSSION

MHH asserts that we do not owe deference to the Administrator's decision allowing the successor intermediary to reopen cost reports for fiscal years 1995 and 1996 and disallowing the alternative cost allocation method approved by the prior intermediary because it contradicted the controlling rules and prior administrative decisions applying them. In addition, MHH submits that the Administrator's decision was not supported by substantial evidence.

A. Reopening and Disallowance of Alternative Allocation Method

MHH contends that the Administrator erred in concluding that the "dictates of the Medicare program set forth in § 1861(v)(1)(A) of

11

the Act," app. at 28, must be elevated above the PRM prior approval provisions. To this end, MHH submits that the Administrator's decision runs afoul of the "plain terms of the agency's own longstanding rules," and that consequently we owe it no deference. See appellant's br. at 22-27. Specifically, MHH argues that the Administrator contravened the plain language of the PRM § 2150.3(D)(2)(b), a "binding interpretative rule." See id. at 24-25. The "plain language" to which MHH refers is, of course, the requirement in PRM § 2150.3(D)(2)(b) that a provider must apply an approved alternative allocation method to all subsequent accounting periods, "unless the intermediary approves a subsequent change for the home office." Nothing in the Administrator's decision, however, contravenes PRM § 2150.3(D)(2)(b), let alone its plain language. There is notably absent from section 2150.3(D)(2)(b) any language indicating that the intermediary's approval binds the Secretary or that the approval insulates a provider from the reopening and retroactive corrective adjustment provisions designed to prevent cross-subsidization. As an analytical matter, it seems entirely possible that a provider may be required to implement an approved alternative allocation method, yet nonetheless remain subject to reopening and audit with an obligation to furnish sufficient, accurate and auditable data supporting its alternative method and claims for reimbursement.

According to MHH, prior approval by an intermediary effectively renders the provider's alternative allocation method binding upon all future cost reports and unreviewable until the intermediary prospectively approves a change. See, e.g., reply br. at 9 (invoking a purported "unbroken series of final agency decisions that recognize the binding effect of an Intermediary's prior approval until after that approval is withdrawn by the Intermediary") (first emphasis added). But PRM § 2150.3(D)(2)(b) does not exist in a vacuum; rather, it is part of the overall Medicare reimbursement scheme, see Guernsey Mem'l Hosp., 514 U.S. at 94, 115 S.Ct. at 1236, which includes the "dictates of the Medicare program set forth in § 1861 (v)(1)(A) of the Act," app. at 28, cited by the Administrator. The question before us is not whether we believe that the Administrator's decision represents the best interpretation of the Medicare statute and regulations but rather whether it is reasonable. See Smiley v. Citibank, N.A., 517 U.S. 735, 744-45, 116 S.Ct. 1730, 1735 (1996). This is particularly so given the scope and complexity of the Medicare statute and regulations, see, e.g., Blumer, 534 U.S. at 497, 122 S.Ct. at 976-77, and the clear congressional directive to the Secretary to promulgate regulations to "provide for the making of suitable retroactive corrective adjustments," see 42 U.S.C. §

12

1395x(v)(1)(A). Given that the plain language of PRM § 2150.3(D)(2)(b) does not bind the Secretary, and in light of the clear congressional prohibition on cross-subsidization and the regulatory machinery in place to achieve compliance with this mandate, we conclude that the Administrator's interpretation is based on a permissible construction of the Medicare statute and regulations.

Furthermore, we reject MHH's argument that we do not owe deference to the Administrator's decision because the decision "suddenly veers from its long established and more contemporaneous interpretation." Appellant's br. at 26; see also reply br. at 2 ("The agency's prior decisional law is uniformly consistent with MHH's position as well."). On the contrary, some cases suggest that a provider remains on notice of an intermediary's authority to reopen and perform retroactive corrective adjustments notwithstanding the intermediary's prior advice. See, e.g., St. Joseph Med. Ctr. v. Blue Cross Blue Shield Ass'n, HCFA Adm'r Dec. No. 94-D76, Medicare and Medicaid Guide (CCH) P 42, 957 (Nov. 14, 1994) ("[W]hile the Provider may have initially relied on incorrect information conveyed by its Intermediary . . . the Provider remained on notice that the Intermediary retained the authority to reopen the determinations in the event that they reflected payment owed in contravention of the governing statutes and regulations[.]").

We recognize that the PRRB suggested in its decision in Extendicare v. BCBSA in 2000 that a provider ought to be able to rely on advice of its fiscal intermediary, but that suggestion is mere dicta supported only by a single agency decision that predated the Supreme Court's decision in Office of Personnel Management v. Richmond, 496 U.S. 414, 420-22, 110 S.Ct. 2465, 2469-70 (1990), abjuring application of equitable estoppel against the government by a party seeking public funds. See Extendicare 1996 Ins. Allocation Group v. BCBSA/United Gov't Serv., PRRB Dec. No. 2000-D88, Medicare & Medicaid Guide (CCH) P 80, 573 (Sept. 26, 2000) (citing Chicago Lakeside Hosp. v. Aetna Life Ins. Co., PRRB Dec. No. 89-D66, Medicare and Medicaid Guide (CCH) P 38, 208 (Sept. 27, 1989), aff'd with modifications, HCFA Adm'r Dec., Medicare and Medicaid Guide (CCH) P 38, 260 (Nov. 20, 1989)). Our result that the prior approval by an intermediary is not binding is consistent with Monongahela Valley Hosp., Inc. v. Sullivan, 945 F.2d 576, 588-89 (3d Cir. 1991), in which we held that OPM v. Richmond foreclosed a Medicare provider's estoppel claim against the Secretary in asserting its claim to additional Medicare reimbursement and that reliance upon intermediary approval as "binding" would not have been reasonable

13

in light of the reopening provisions.

Overall, we are satisfied that contrary to MHH's claim, the agency's prior decisions hardly constitute "an unbroken series" of final decisions "uniformly consistent with MHH's position." Reply br. at 2. If anything, the prior decisions can be characterized as elevating Medicare cost principles above the prior approval provisions found in the PRM. As noted by the Administrator, it is significant that prior agency decisions have held that "the lack of prior approval is secondary to the Medicare cost principle prohibiting cost shifting and [to] the accurate payment of costs." See app. at 29 (citing Sunbelt Health Care Ctrs. Group Appeal v. Aetna Life Ins. Co., PRRB Dec. No. 97-D13, Medicare and Medicaid Guide (CCH) P 44, 923, (Dec. 3, 1996)). It was reasonable for the Administrator to conclude that, just as Medicare cost principles take priority over the absence of prior approval, so, too, do the same cost principles take priority over the presence of prior approval. App. at 29 ("[T]he existence of prior approval in this case does not negate those same Medicare principles and permit the payment of costs not otherwise allowable.").

B. Substantial Evidence

1. Burden of Producing Adequate Cost Data

As a threshold matter on the substantial evidence issue, the parties disagree about allocating the burden of proof, an inquiry separate from, albeit related to, the sufficiency of the evidence. MHH argues that it was "saddled with the affirmative burden of reproving the accuracy of [the first alternative allocation] method based on data that it was not required to have." Appellant's br. at 38-39. MHH claims the Administrator thus contravened "the broader principle that an agency bears the affirmative burden of justifying a change from a position previously taken." Appellant's br. at 38 (citing Motor Veh. Mfrs. Ass'n v. State Farm Mut. Ins. Co., 463 U.S. 29, 46-47, 103 S.Ct. 2856, 2868-69 (1983); Atchison, Topeka & Santa Fe R.R. v. Wichita Bd. of Trade, 412 U.S. 800, 808, 93 S.Ct. 2367, 2375 (1973)). The cases cited by MHH stand for the principle that an agency must justify a departure from past practice that results in reversal of agency policy. See Motor Veh. Mfrs. Ass'n, 463 U.S. at 41-42, 103 S.Ct. at 2865-66; Atchison, 412 U.S. at 807-808, 93 S.Ct. at 2375-76. As explained above, however, here there was no such reversal in agency policy.

14

Furthermore, contrary to MHH's contention, none of the cases it cites establish a rule whereby the approval of an intermediary shifts the burden of proof on the sufficiency of the evidence to the Secretary. Rather, in both of the cases cited, the PRRB based its decisions, in part, on findings that the providers proffered adequate costs data capable of verification. See VNA of Dallas v. BC/BS Group Hosp. Servs., Inc., PRRB Dec. No. 87-D100, Medicare and Medicaid Guide (CCH) P 36, 647 (Sept. 3, 1987) ("Rarely has the Board seen either the extent or the quality of documentary evidence as that presented by the provider in this case to support the Board's conclusion [that the provider's time studies were auditable].") (emphasis added), aff'd, HCFA Adm'r Dec., Medicare and Medicaid Guide (CCH) P 36, 751 (Nov. 4, 1987); Rhode Island Hosp. v. Blue Cross and Blue Shield Ass'n, HCFA Adm'r Dec., Medicare and Medicaid Guide (CCH) P 34, 968 (Aug. 26, 1985) ("The Board reviewed the evidence presented in this case, and found that the records and statistical data maintained and furnished by the provider were sufficient to support [its cost method].") (emphasis added).

The governing statutes and regulations indicate that the burden of proof remains on the provider. The PRM provision upon which MHH primarily relies places the burden upon providers to make a "written request with its justification to the intermediary" when seeking to utilize an alternative allocation method. See PRM § 2150.3(D)(2)(b). With regard to reimbursement generally, the statute itself prohibits payment "unless [the provider] has furnished such information as the Secretary may request in order to determine the amounts due such provider" for the particular cost period at issue. 42 U.S.C. § 1395g(a). Similarly, the Secretary's implementing regulation requires that "[p]roviders receiving payment on the basis of reimbursable cost must provide adequate cost data." 42 C.F.R. § 413.24(a). As noted above, the data must be "capable of being audited," and be "accurate and in sufficient detail to accomplish the purposes for which it is intended." 42 C.F.R. § 413.24(c). Accordingly, the Administrator did not err in requiring MHH to produce adequate cost data to support its alternative allocation method and claim for reimbursement.

2. Sufficiency of Evidence

Substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427 (1971) (quoting Consol. Edison Co. v. NLRB,

15

305 U.S. 197, 229, 59 S.Ct. 206, 217 (1938)).  In our review, we do not consider the case de novo with respect to the Administrator, resolve conflicts in the evidence, or decide questions of credibility. Myers v. Sec'y of Health & Human Servs., 893 F.2d 840, 842 (6th Cir. 1990).

MHH asserts that the Administrator's decision was not supported by substantial evidence.  In particular, MHH argues that "[m]ost significantly, [the Administrator] rendered no independent findings relating to the allocations in FY '95 & '96, but relied entirely on the PRRB's findings relating to FY '97-'99[,]" thereby rejecting the first alternative allocation method (1995-1996) based on findings related to the second alternative allocation method (1997-1999). Reply br. at 22-23.  We acknowledge that this argument appears persuasive on its face, but it is critical to understand that it is premised on the first alternative allocation method at issue being materially different from the second alternative method, the rejection of which MHH does not challenge.  That premise, however, is belied by the Administrator's stated justifications:

> With respect to FYs 1997 through 1999, the Administrator agrees with the Board's determination that the Intermediary's adjustments to the Provider's home office cost statements were proper.  As the Provider set forth, its rationale for the methodology used for the FYs 1995 and 1996 period is also its rationale for the FYs 1997 through 1999 period methodology.  The record shows that the Provider failed to collect data or provide any specific computations or reasonable justification to support their contention that the alternative method in fact resulted in more equitable and accurate allocation of costs.  The record also shows, as the Board agreed, that the Provider did not offer a valid rationale for excluding the cost of goods sold from the CMS-prescribed allocation method.

App. at 29-30 (footnotes omitted) (emphasis added).

Thus, the Administrator explained the reason for rejecting the first alternative allocation method based on findings related to the second alternative method:  the two methodologies were "very similar," in that "[t]he Provider sets forth [the] same unsupportable rationale for the very similar methodology used for FYs 1995 through 1999."  App. at 30 n.7.  This finding that the two allocation methods were based on the same rationale is bolstered by MHH's own consolidated post-hearing brief, see app. at 29 n.6, in which MHH

16

explained that its rationale for excluding certain cost of goods sold was "equally applicable" to both methodologies. <u>See</u> provider's consol. post-hr'g br. at 17, n.9.

Notably, the PRRB rejected the "equally applicable" rationale as applied to the 1997-1999 methodology:

> The Board is persuaded by the Intermediary's argument that the cost of labor in the service-oriented affiliates could just as well be equated to the 'cost of goods sold' in the [durable medical equipment] affiliate. Thus, there is no valid rationale for excluding the cost of goods sold from the CMS-prescribed allocation methodology.

App. at 20. Accordingly, on this record substantial evidence supports the Administrator's decision that the flawed, rejected rationale underlying the 1997-1999 methodology was "equally applicable" to the 1995-1996 methodology, thus warranting rejection of the 1995-1996 methodology.

## V.   CONCLUSION

For the foregoing reasons, we will affirm the order of the district court entered March 18, 2005.