NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 09-3703
_____

HACKENSACK UNIVERSITY MEDICAL CENTER,
                                        Appellant

v.

KATHLEEN SEBELIUS,

Secretary, Health and Human Services,
(Substituted Pursuant to F.R.A.P. 43(c))
_____

On Appeal from the United States District Court
for the District of New Jersey
(D.C. No. 08-cv-625)
District Judge: Honorable Susan D. Wigenton
_____

Argued February 25, 2010

Before:   CHAGARES, STAPLETON, and LOURIE,* *Circuit Judges.*

(Filed: May 14, 2010)

_____
        *Honorable Alan D. Lourie, Circuit Judge of the United States Court of Appeals
for the Federal Circuit sitting by designation.

Clifton S. Elgarten
Robert L Roth (Argued)
Crowell & Moring LLP
1001 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
          *Counsel for Appellant*

Paul J. Fishman
United States Attorney
Susan Handler-Menahem (Argued)
Assistant U.S. Attorney
District of New Jersey
970 Broad Street
Suite 700
Newark, NJ 07102
          *Counsel for Appellees*

_____

OPINION OF THE COURT
_____

LOURIE, *Circuit Judge*.

Hackensack University Medical Center ("Hackensack") appeals from the order of the District Court for the District of New Jersey granting summary judgment in favor of appellee Kathleen Sebelius, Secretary of the United States Department of Health and Human Services ("the Secretary"), affirming the Provider Reimbursement Review Board's ("PRRB") decision allowing only a temporary adjustment to Hackensack's resident cap and denying a permanent exception to the cap. *Hackensack Univ. Med. Ctr. v. Johnson*, No. 08-0625, 2009 WL 2168719 (D.N.J. July 17, 2009). Because Hackensack has failed to show that the District Court erred in its decision, we will affirm.

## I. BACKGROUND

Hackensack is a not-for-profit hospital that trains residents at its facility as part of the resident training program for the University of Medicine and Dentistry of New Jersey ("UMDNJ"). Pursuant to the Medicare Act, 42 U.S.C. § 1395 *et seq*., Hackensack receives Medicare payments under the Prospective Payment System ("PPS") to reimburse it for certain costs associated with its medical education program. These payments are based on the number of full-time equivalent residents ("FTEs") trained at the hospital. In February 1997, another hospital that trained residents from UMDNJ, United Hospital ("United") declared bankruptcy and closed permanently. In all, United had 49.5 FTEs rotating through its facility when it went out of business. Those residents were displaced by United's bankruptcy and closure.

Besides Hackensack and United, other hospitals that trained UMDNJ residents in 1996 included Morristown Memorial Hospital, St. Michael's Medical Center, and UMDNJ's own hospital. Following United's closure, the other hospitals began negotiating the placement of the displaced residents. The four hospitals subsequently reached an agreement known as the "Agreement for an Aggregated Count of Residency Positions" ("the Agreement"), according to which United's FTEs were reallocated among the remaining four hospitals. Under the Agreement, 12 of the 49.5 FTEs were allocated to Hackensack for the academic years 1997 and 1998. The academic year for UMDNJ residents begins on July 1 and ends on June 30. The Agreement was entered into in June 1998, long after United had

3

shut down. United was therefore not a signatory to the Agreement.

In 1997, Congress enacted the Balanced Budget Act of 1997 (the "Act"), capping the number of residents for whom Medicare provides reimbursement at levels that existed in 1996. However, in cases where hospitals share residents, the Act allows the Secretary to make adjustments to the number of FTEs at each individual hospital as long as the aggregate number of FTEs in the affiliated group remains capped.

Based on the Agreement, Hackensack asked the Medicare Intermediary, Blue Cross and Blue Shield of New Jersey ("the Intermediary"), to permanently raise its resident cap by 12 FTEs. After seeking guidance from the Center for Medicare and Medicaid Services ("CMS"),[1] the Intermediary denied Hackensack's request for a permanent increase. Hackensack appealed the Intermediary's decision to the PRRB, an independent panel of HHS, in January 2003.

In November 2003, the Intermediary granted Hackensack a temporary adjustment to allow for some of the costs claimed by Hackensack for accommodating the displaced United residents in the fiscal year 1998. The Intermediary allotted 4.74 FTEs for Indirect Medical Education costs and 4.38 FTEs for Direct Graduate Medical Education costs. Hackensack appealed that temporary adjustment to the PRRB as well.

---

[1] The Secretary delegates the responsibility of distributing Medicare payments for resident training to the CMS, an agency within the Department of Health and Human Services ("HHS").

The PRRB held a hearing on February 28, 2006 and rendered its decision on December 3, 2006. The PRRB agreed with the Intermediary that the Agreement was not an "affiliation agreement" with respect to United under the HHS regulation, which allows members of an affiliated group to reallocate their aggregate FTEs. *See* 63 Fed. Reg. at 26341. That was because United was not a signatory to the Agreement and did not exist at the time the Agreement was entered into. United's FTEs could thus not be reallocated to other hospitals. The PRRB therefore concluded that the Intermediary correctly denied Hackensack's request for a permanent increase to its resident cap. The PRRB also found that, absent evidence to support any alternative method, the Intermediary's temporary increase calculation was proper. On January 31, 2008, the CMS administrator notified Hackensack that the PRRB decision would not be further reviewed. The next day, Hackensack filed a complaint in the District Court for the District of New Jersey seeking additional Medicare payments that had been denied by the Intermediary.

In the District Court, Hackensack moved for summary judgment that it was entitled to a permanent exception to its resident cap for Medicare payments, and that the methodology used to calculate the temporary increase to its reimbursement for the fiscal year 1998 was facially irrational. The Secretary moved for summary judgment affirming both of the PRRB's decisions. The District Court, after considering all of the evidence presented to it as well as the statutory purpose of the resident cap, granted the Secretary's motion for summary judgment and denied Hackensack's. Hackensack timely appealed. We have

5

jurisdiction pursuant to 28 U.S.C. § 1291.

## II. DISCUSSION

Our standard of review of a grant of summary judgment is plenary. *Gardner v. State Farm Fire & Cas. Co.*, 544 F.3d 553, 557 (3d Cir. 2008). Under the Administrative Procedure Act, we may only set aside agency actions, findings, and conclusions that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or "unsupported by substantial evidence." 5 U.S.C. § 706(2)(A), (E). "Substantial evidence is 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Mercy Home Health v. Leavitt*, 436 F.3d 370, 380 (3d Cir. 2006) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).

### A. Permanent Exception to Hackensack's Resident Cap

Hackensack argues that the District Court erred in affirming the PRRB's denial of its permanent increase claim. Hackensack argues that the Secretary is not allowed to reduce the total number of residents being trained at an affiliated group of hospitals. Hackensack contends that under sections 4621 and 4623 of the Act, Congress simply intended to cap the number of residents, not to cut residents from existing programs. By allowing the Secretary to apply caps on an aggregate basis, Hackensack argues, Congress clearly provided for affiliated hospitals to reallocate shared residents without increasing resident counts. According to Hackensack, the PRRB misread the law to force a decrease in resident levels any time an affiliated hospital shuts down.

6

Hackensack further argues that the Secretary retroactively imposed an impossible requirement that the affiliation and reallocation of resident positions be subject to a signed agreement between all hospitals involved. Hackensack points out that the individual residents were in fact rotating between the various New Jersey hospitals even before the Act was enacted. Therefore, Hackensack contends that all of those hospitals did qualify as being affiliated under the regulation, and, under the Act, they were allowed to reallocate residents, regardless whether United signed the reallocation Agreement or not. Hackensack argues that Congress could not have intended to authorize the Secretary to reduce resident levels and thereby adversely impact medical education and access to medical care.

In response, the Secretary argues that the hospitals that entered into the Agreement did not constitute an "affiliated group" as defined by the regulation. The Secretary points out that under the regulation, the definition of an affiliated group requires that the individual residents work at each of the hospitals that are part of the group. Under that definition, the Secretary argues, after United closed, none of the residents worked at United, and United could not have been a part of any affiliated group. Moreover, the Secretary argues, under the regulation that existed in 1997, United's signature was essential to any reallocation agreement between the affiliated hospitals in order for it to be valid. Regarding the retroactive enforcement of the statute, the Secretary argues that the statute employs 1996 as the base year to determine the cap and is therefore applicable to Hackensack's claim regardless when Hackensack took on the United FTEs. The Secretary also argues that its

7

interpretation of the statute does not run afoul of congressional intent because the legislative history of the Act shows that Congress was clearly concerned about gaming of residents by hospitals. In fact, it notes, Congress has offered incentives to hospitals that reduce the number of eligible residents at their facilities.

We agree with the District Court and the Secretary that the Secretary's decision denying a permanent increase in FTEs for Hackensack was not arbitrary or capricious and that it was supported by substantial evidence. By enacting the Act, Congress "capped" the number of FTEs that a hospital can claim for Medicare Direct Graduate Medical Education costs and Indirect Medical Education costs purposes. *See* §§ 4621 and 4623 of the Act, Pub. L. No. 105-33 (August 5, 1997), codified at 42 U.S.C. §§ 1395ww(d)(5)(B)(v), 1395ww(h)(4)(F). In relevant part, the Act provides as follows:

> [F]or purposes of a cost reporting period beginning on or after October 1, 1997 the total number of full-time equivalent residents . . . may not exceed the number of such full-time equivalent residents for the hospital's most recent cost reporting period ending on or before December 31, 1996.

42 U.S.C. § 1395ww(h)(4)(F)(i).

Congress did, however, allow for a permanent exception to the cap by, pursuant to Section 4623 of the Act, permitting the Secretary to prescribe rules that allow only member institutions of an affiliated group to elect to apply the FTE cap on an aggregate basis:

> The Secretary may prescribe rules which allow institutions which are members of the same affiliated group (as defined by the Secretary) to elect to apply the limitation . . . on an aggregate basis."

*Id.* § 1395ww(h)(4)(H)(ii). The Secretary has defined an "affiliated group" as follows:

8

> Two or more hospitals located in the same urban or rural area . . . or in contiguous areas if individual residents work at each of the hospitals during the course of the program . . . .

63 Fed. Reg. at 26,336 codified at 42 C.F.R. § 413.86(b)(1) (1998).

Under the plain language of that definition, the group of hospitals that entered into the Agreement in June 1998, well after the United shutdown, was clearly not an affiliated group that included United. The District Court was correct in stating that the individual residents no longer worked at United and that United was not a signatory to the Agreement to redistribute its FTEs. Therefore, it was proper for the Secretary to consider the hospitals to be no longer affiliated with United. Absent an affiliated group, it would have been a violation of the statute for the Secretary to have allowed Hackensack, or any of the other New Jersey hospitals, to unilaterally increase the number of its residents solely because one of the hospitals in the region had gone out of business.

Hackensack mistakenly implies that since the Secretary cannot increase the aggregate number of residents over existing levels under the Act, she is not authorized to decrease that number either. However, the clear intent of the Act is also to limit the number of residents both at national and facility levels. *See* H.R. CONF. REP. NO. 105-217, at 821 (1997), *reprinted in* 1997 U.S.C.C.A.N. 176, 442. Furthermore, as the District Court noted, Congress enacted an incentive under the Act for hospitals to reduce the number of residents by five percent. *See* 42 U.S.C. § 1395ww(h)(6). The District Court also noted that the House Committee Report lists Congress's concerns with hospitals gaming residency

9

positions, given the large Medicare payments they receive for each resident. *See* H.R. REP. NO. 105-149, at 1366 (1997). In light of that, the District Court reasoned that the PRRB's decision was in line with the congressional intent behind the Act. We agree. Hackensack can point to nothing that demonstrates that Congress intended to allow affiliated hospitals to increase the number of residents reimbursed by Medicare at their facilities any time one of the affiliated hospitals closes. Moreover, given her finding that an affiliated group did not exist, the Secretary's refusal to permanently reallocate a shutdown facility's FTEs was not, as Hackensack claims, clearly a reduction of the aggregate number of residents at an affiliated group of hospitals.

Hackensack also argues that the correct time for determining whether United was part of an affiliated group is the fiscal year 1996. However, the Agreement to reallocate the residents did not occur until 1998, when United was no longer in business. The relevant time to determine whether an affiliated group existed is therefore 1998, and, at that time, United was not a part of an affiliated group of hospitals.

## B. Temporary Exception to Hackensack's Resident Cap

Hackensack next argues that the Intermediary's calculation of the temporary adjustment of 4.74 FTEs for Indirect Medical Education costs and 4.38 FTEs for Direct Graduate Medical Education costs to Hackensack for the displaced United residents that it accommodated in fiscal year 1998 was arbitrary. Hackensack argues that it took on the burden from United of continuing the training of 12 FTEs, and the Intermediary could have

10

simply calculated a temporary increase based on resident slots. Because residents train at a facility for only part of the year, 12 FTEs may correspond to many more individual residents. Hackensack argues that the Intermediary erred by trying to trace the movements of specific residents displaced by United's closure. That, Hackensack argues, was a task of utmost complexity, leading the Intermediary to abandon it and arbitrarily use a sample of two months to determine the appropriate increase in Hackensack's burden. According to Hackensack, that snapshot technique is not a proper mathematical sample and does not reflect most of the potential United resident rotations for most of the year. At the very least, it argues, it was entitled to a temporary increase of 7.5 FTEs for the fiscal year 1998. Hackensack bases this calculation on the United slots that it picked up and the average residency period for each of those slots. It argues that it was entitled to a total increase of 9 FTEs in the period of January through June 1998 and 6 FTEs for the period from July through December 1998. Hackensack argues that the Secretary's rationale in upholding the Intermediary's approach based on the lack of documentation supporting a different methodology is indeed arbitrary. Hackensack contends that it presented proposed resident rotation schedules, which the Intermediary rejected outright. It contends that those resident records provided the best available evidence of which residents would have been trained at United from July 1, 1996 through June 30, 1997 and was the best measure of Hackensack's burden.

11

In response, the Secretary argues that under the regulation, the purpose of a temporary increase is solely to allow 1996-97 residents to complete their training, and the Intermediary's calculation accomplished that purpose. The Secretary points out that Hackensack initially submitted no documentation for a temporary increase, and when it later did so, the documentation was unreliable in establishing which of the potential United residents rotated through Hackensack during the year. The Secretary argues that it was Hackensack's burden to prove its entitlement to a temporary increase and that Hackensack failed to do so. She points out that Hackensack's claim for a temporary increase has been a moving target. Given the fact that 12 slots do not equate to 12 residents that Hackensack had to train, and that resident schedules changed frequently, the Secretary argues, Hackensack's request for a slot-based reimbursement is unsupported by any reliable evidence and would result in an unjust benefit to Hackensack. Instead, the Secretary contends, the Intermediary properly chose to rely on the actual number of residents who were at United in the two months preceding its closure and compared those residents with Hackensack's 1998 rotation schedules and sign-in sheets. The Intermediary also reviewed the audit work papers for United for its fiscal year ending in 1997 and arrived at the temporary increase figures to which Hackensack was entitled. That, the Secretary argues, was clearly the most reliable evidence before the Intermediary. The Secretary urges us to affirm the District Court's finding that in the absence of an alternate reliable method, the method employed by the Intermediary and approved by the PRRB cannot be considered arbitrary.

12

We agree and conclude that the Secretary's decision was not arbitrary or capricious. The burden of proving a claim for reimbursements under the Medicare statute rests with the hospital making the claim for reimbursement and the Secretary may require specific documentation to prove the claim. *See* 42 U.S.C. §1395ww(h)(4)(H)(iii); *see also Girling Health Care Inc.v. Shalala*, 85 F.3d 211, 215-16 (5th Cir. 1996) (holding that the provider carries the burden of maintaining financial records for proper determination of costs payable under the program). Here, Hackensack failed to meet its burden of demonstrating that it was entitled to a higher increase than the one calculated by the Intermediary. It is undisputed that the rotation schedules submitted by Hackensack were indeed unreliable to accurately determine where the residents actually trained.

As discussed above, Congress's intent behind enacting the Act was to impose caps on the number of residents that are reimbursed under Medicare, and the regulation on temporary increases specifically requires that any increase be limited to reimbursing a facility accommodating actual displaced residents. *See* 63 Fed. Reg. at 26330. In keeping with that regulatory purpose, the Intermediary initially attempted to determine the actual number of displaced residents by tracking resident movements between the hospitals over the year. However, as Hackensack concedes, there was no evidence that accurately demonstrated resident movements. It was only then that the Intermediary decided to use a sampling method to calculate the increase. Given the lack of reliable evidence, the Intermediary did not err in relying on the one piece of evidence that was in fact reliable, namely, the list of

residents who were at United at the time it shut down. In determining how many FTEs Hackensack had taken, the Intermediary compared the list of residents last trained at United with Hackensack's 1998 rotation schedules and sign-in sheets. The Intermediary's method at least ensured that Hackensack would be reimbursed for residents that were directly impacted by United's closure. In all, we find that there is substantial evidence to support the method that the Intermediary used to calculate a temporary increase. *See Mercy Home Health,* 436 F.3d at 380 (holding that substantial evidence is evidence that a reasonable mind might accept as adequate to support a conclusion). Because the Secretary's decision took into account relevant evidence, and it was rational under the circumstances presented here, we will affirm. *See Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

### III. CONCLUSION

For the foregoing reasons, we will affirm the District Court's order affirming the PRRB's decision to allow only a temporary adjustment to Hackensack's resident cap and denying a permanent exception to the cap.

14