

2009 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

5-22-2009

# Albert Einstein v. Secretary HHS

Precedential or Non-Precedential: Precedential

Docket No. 07-3807

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2009

Recommended Citation

"Albert Einstein v. Secretary HHS" (2009). *2009 Decisions.* Paper 1269.
http://digitalcommons.law.villanova.edu/thirdcircuit_2009/1269

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2009 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———

No. 07-3807

———

ALBERT EINSTEIN MEDICAL CENTER,
SUCCESSOR IN INTEREST TO
GERMANTOWN HOSPITAL AND
MEDICAL CENTER, INC.,

Appellant

v.

†Kathleen Sebelius, Secretary of the United States
Department of Health & Human Services

(†Kathleen Sebelius is substituted for her predecessor
Michael O. Leavitt, as Secretary of the
United States Department of Health & Human Services,
pursuant to Fed. R. App. P. 43(c)(2))

———

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. No. 04-cv-06059)
District Judge: Honorable Ronald L. Buckwalter

———

Argued October 31, 2008

Before: SLOVITER, STAPLETON and TASHIMA[*],
Circuit Judges

————————

[*] Honorable A. Wallace Tashima, Senior Judge of the United States Court of Appeals for the Ninth Circuit, sitting by designation.

(Filed  May 22, 2009)

_____

Carel T. Hedlund   (Argued)
Ober, Kaler, Grimes & Shriver
Baltimore, MD 21202

        Attorney for Appellant

Joel L. McElvain     (Argued)
United States Department of Justice
Civil Division, Federal Programs Branch
San Francisco, CA 94102

Michael S. Raab
United States Department of Justice
Washington, DC 20530

        Attorneys for Appellee

____

OPINION OF THE COURT

____


SLOVITER, Circuit Judge.

    Germantown Hospital and Medical Center ("Old Germantown") submitted to the representative of the Secretary of Health and Human Services, the Centers for Medicare and Medicaid Services ("CMS" or "Administrator"), a reimbursement claim for loss on depreciable assets resulting from its 1997 statutory merger into Germantown Hospital and Community Health Services ("New Germantown").  The Administrator denied the claim because he found that the Old Germantown merger was between "related parties" and did not constitute a "bona fide sale."  Albert Einstein Medical Center, Inc. ("Einstein"), as successor-in-interest to Old Germantown and New Germantown, filed an action in federal court challenging the Administrator's interpretations of the relevant

regulations and, in the alternative, challenging the Administrator's factual findings based on those regulatory interpretations. The District Court, the Honorable Ronald L. Buckwalter of the United States District Court for the Eastern District of Pennsylvania, granted summary judgment to the Secretary upholding the decision of the Administrator. Einstein appeals.

## I.

### Factual and Procedural Background

Prior to the 1997 merger at issue in this case, Old Germantown was a not-for-profit hospital, located in Philadelphia, Pennsylvania. David Ricci, who had served as President and CEO, testified before the Provider Reimbursement Review Board ("PRRB") that as a result of the development of managed care and healthcare systems in Philadelphia in the early 1990s, small hospitals realized that they needed to "join[] stronger organizations in order for them to have a future." App. at 685. By the mid-nineties, Old Germantown had seen a decline in admissions and was operating only 125-150 of its 255 licensed beds. Ricci stated that this reduction in patient volume, combined with a "feeding frenzy for acquiring physician practices," caused Old Germantown difficulty in retaining specialists. App. at 685. As a result, Old Germantown experienced yearly operating losses, with its 1996 operating loss amounting to between $2.3 and $2.5 million. In 1996, Old Germantown's outstanding liabilities totaled more than $30 million, including approximately $11.6 million in long-term debt. At about that time, Old Germantown's primary lender decided that the hospital was such a credit risk that it would no longer extend credit to Old Germantown.

By 1997, Old Germantown's assets included endowment funds of approximately $37.9 million in principal, but the hospital could use only the annual interest from these funds. Accordingly, the principal could not be used to satisfy Old Germantown's debts or serve as collateral on future loans. In 1996, the interest income from these endowments was roughly

$1.3 million, but there were also restrictions on the permissible uses of the interest income of many of these funds. Therefore, even much of the interest income from these restricted funds could not be used to pay Old Germantown's debts.

Acknowledging the seriousness of its financial predicament, Old Germantown sent a request for proposal ("RFP") to several healthcare systems on December 10, 1996, seeking a merger or a sale of assets. Old Germantown's RFP stated:

> The principal objectives the [Old] Germantown Board expects to consider in evaluating proposals will be to: (i) ensure that Germantown continues to serve the health care needs of its community; (ii) enhance the health care services available at Germantown; (iii) maintain, to the extent possible, Germantown's workforce; (iv) achieve a fair value for Germantown's business and assets; and (v) consummate any acceptable transaction expeditiously.

App. at 252.

In response, Old Germantown received proposals from the Albert Einstein Healthcare Network ("AEHN"),[1] Temple

---

[1] Albert Einstein Medical Center, Inc. ("Einstein"), the appellant in this case, must be distinguished from the Albert Einstein Healthcare Network ("AEHN"), "a diversified organization that includes a network of healthcare facilities and services located throughout the [Philadelphia] metropolitan area." App. at 284. AEHN negotiated the 1997 statutory merger with Old Germantown and created a new subsidiary, New Germantown, for the purpose of that merger. Due to New Germantown's continuing losses, it was merged into Einstein, a preexisting subsidiary of AEHN, on July 1, 1999. As Einstein explained to the District Court, "The assets of New Germantown, including Old Germantown's claim for Medicare reimbursement for the loss incurred upon its merger into New Germantown, passed by operation of law to [Einstein]." Plaintiff's Memorandum in

4

University, and Primary Health Systems, Inc. ("PHS").[2]

AEHN proposed to create a new subsidiary within its healthcare network that would assume all of Old Germantown's assets and liabilities. AEHN's proposal also provided that the Board of the new entity would "include current members of the [Old] Germantown Board of Trustees, current management and medical staff leadership as well as AEHN designees." App. at 276. In addition, AEHN would invest $6 million in the new entity over the course of its first five years of existence in order "to increase services to the community and to insure continued access to current healthcare services." App. at 280.[3]

PHS proposed to purchase the physical assets of Old Germantown for $15 million, with Old Germantown retaining all its other assets and liabilities (including its limited-use endowments) to pay off its debts and liabilities. The proposal was silent as to any continuing role of Old Germantown principals within the governing structure of the hospital after the sale.

Old Germantown opted to pursue a merger with AEHN. The parties entered negotiations and the terms agreed upon were reflected in a non-binding Letter of Intent from AEHN's president, dated February 28, 1997. The letter stated that AEHN would create a new subsidiary that would merge with Old Germantown, that members of Old Germantown's management would have places on the Board of Trustees of the new entity, and that additional members of the Board would be appointed from the community served by the hospital "based upon

_____

Support of Motion for Summary Judgment at 12 n.9, *Albert Einstein Medical Center, Inc. v. Leavitt*, No. 04-6059 (E.D. Pa. Mar. 14, 2006).

[2] PHS is a hospital management company headquartered in Wayne, Pennsylvania.

[3] Temple made a similar proposal (absent the pledge of the $6 million). The parties do not discuss Temple's offer on appeal.

5

recommendations submitted by [Old] Germantown" to AEHN. App. at 308. However, the Letter of Intent noted that the "above stated board composition shall be subject to the parties' intentions to maximize Medicare recapture." App. at 308. In addition, the Letter of Intent stated that the members of Old Germantown's Board who were not offered places on the new entity's Board of Trustees would be "offered the opportunity to serve on AEHN's Board of Directors." App. at 309. The Letter of Intent also stated that the "parties intend to preserve, to the extent possible, [Old] Germantown's existing senior management." App. at 309. Finally, AEHN reiterated its plan to contribute $6 million in funds to the new entity over the first five years of its existence.

Old Germantown and AEHN signed a definitive agreement ("Agreement") on May 30, 1997. In large part, the Agreement preserved the terms reflected in the Letter of Intent, except with respect to the composition of the new entity's Board of Trustees and AEHN's Board of Directors. The new entity, New Germantown, would have a Board of Trustees of up to forty members and include four members from Old Germantown's Board, three members of Old Germantown's medical staff, at least two of whom had not previously sat on its Board, the President and CEO of Old Germantown, twelve members from the Germantown community (not to be recommended by Old Germantown, as the Letter of Intent had contemplated), and up to twenty members chosen by AEHN. All Board members would be subject to the approval of the AEHN "Nominating Committee, which approval shall not be unreasonably withheld." App. at 338. Old Germantown's Chairman of the Board as of the date of the merger would serve as the initial Chairman of the Board of New Germantown. Two members of Old Germantown's Board of Trustees would serve on the "Executive Committee of [AEHN]'s Board of Directors," and in addition AEHN would offer the remaining members of Old Germantown's Board "the opportunity to serve on [AEHN]'s Board of Directors." App. at 338. Finally, the President and CEO of Old Germantown would become the President and CEO of New Germantown.

With respect to the composition of the new Board, David Ricci, who had served as President and CEO of Old Germantown, and now served as President and CEO of New Germantown, later conceded at the hearing before the PRRB that Old Germantown was worried about having more than twenty percent representation on the new Board because it wanted to "minimize anything that would jeopardize the loss of those [Medicare] dollars we believe we were rightfully owed." App. at 710.

In June of 1997, AEHN created a subsidiary under the name of Germantown Hospital and Community Health Services ("New Germantown"), a non-profit corporation, and on September 1, 1997, the parties completed the merger of Old Germantown into New Germantown according to the terms of the Agreement. Effective as of this merger, Old Germantown ceased to exist and all of its assets and liabilities passed to New Germantown by operation of law. The monetary assets assumed by New Germantown were valued at $57.9 million (including the $37.9 million in endowment funds), and the fixed assets were valued at $14.5 million, totaling slightly over $72 million. In exchange for gaining these assets, New Germantown assumed Old Germantown's liabilities of $34 million. As anticipated, AEHN also pledged $6 million in "contingent consideration" to be paid to New Germantown over the next five years. App. at 64.

On May 27, 1998, New Germantown submitted a final cost report to Medicare's fiscal intermediary on behalf of Old Germantown, claiming that it had "incurred a loss on sale of depreciable assets" through its merger with New Germantown, and sought reimbursement. App. at 620. Because the consideration (liabilities assumed by New Germantown) was less than the assets' "net book value" (described below), New Germantown's position was that the assets had depreciated more than Medicare had estimated and that, as a result, Medicare's share of that loss was $4,876,356, later revised to $4,793,668.

On May, 26, 1999, Medicare's fiscal intermediary denied the claimed loss, and New Germantown appealed the decision to

the PRRB, which allowed the claim on September 1, 2004. However, the Administrator reversed the PRRB decision, disallowing the loss because he concluded that the merger was between "related parties" and did not constitute a "bona fide sale." Einstein, as successor-in-interest to New Germantown and Old Germantown, sought review of the Administrator's decision in the District Court for the Eastern District of Pennsylvania, which granted summary judgment in favor of the Secretary on August 1, 2007. *Albert Einstein Medical Center, Inc. v. Leavitt (Einstein)*, No. 04-6059, 2007 WL 2221417 (E.D. Pa. Aug. 1, 2007). The District Court held that the Secretary's interpretations of 42 C.F.R. § 413.17 ("Related Party Regulation"), 42 C.F.R. § 413.134(k)(2) ("Statutory Merger Provision"), and 42 C.F.R. § 413.134(f)(2) ("Bona Fide Sale Provision") were reasonable and consistent with CMS' prior interpretations. *Einstein*, 2007 WL 2221417 at *10-12. In addition, the District Court found that the Secretary's factual findings were based on substantial evidence. *Id.* at *11, 14. Einstein timely filed a notice of appeal with this court.

## II.

### Jurisdiction and Standard of Review

The District Court had jurisdiction to review the Administrator's decision under 42 U.S.C. § 1395oo(f)(1) and we have jurisdiction under 28 U.S.C. § 1291. We review the agency's decision under the standards set forth in the Administrative Procedure Act ("APA"), 5 U.S.C. § 706. 42 U.S.C. § 1395oo(f)(1). As such, we "can set aside the Administrator's decision only if it is 'unsupported by substantial evidence,' is 'arbitrary, capricious, an abuse of discretion, or [is] otherwise not in accordance with law.'" *Mercy Home Health v. Leavitt*, 436 F.3d 370, 377 (3d Cir. 2006) (quoting 5 U.S.C. §§ 706(2)(A), (E)) (alteration in original). "Substantial evidence is 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Mercy Home Health*, 436 F.3d at 380 (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).

8

Moreover, we "must afford substantial deference to an agency's interpretation of its own regulations." *Mercy Home Health*, 436 F.3d. at 377 (citing *Thomas Jefferson Univ. Hosp. v. Shalala*, 512 U.S. 504, 512 (1994)). As we have noted, "[t]his broad deference is particularly appropriate in contexts that involve a 'complex and highly technical regulatory program, such as Medicare, which requires significant expertise and entail[s] the exercise of judgment grounded in policy concerns.'" *Id.* (quoting *Thomas Jefferson Univ. Hosp.*, 512 U.S. at 512).

"In sum, so long as an agency's factfinding is supported by substantial evidence, reviewing courts lack power to reverse either those findings or the reasonable regulatory interpretations that an agency manifests in the course of making such findings of fact." *Monsour Med. Ctr. v. Heckler*, 806 F.2d 1185, 1191 (3d Cir. 1986). Because this court applies the same standard of review as the District Court, we "proceed de novo with respect to our review of the district court disposition." *Mercy Home Health*, 436 F.3d at 377.

### III.

### Statutory and Regulatory Framework

### A. Provider Reimbursement

Title XVIII of the Social Security Act ("Medicare Act") establishes a healthcare program for the aged and disabled known as "Medicare," 42 U.S.C. § 1395 *et seq.*, which reimburses healthcare providers for the "reasonable cost" of providing services to Medicare beneficiaries, 42 U.S.C. § 1395f(b)(1). The Medicare Act defines "reasonable costs" as "the cost actually incurred, excluding therefrom any part of incurred cost found to be unnecessary in the efficient delivery of needed health services." 42 U.S.C. § 1395x(v)(1)(A).

Under the Medicare Act, the Secretary of Health and Human Services is authorized to promulgate "regulations establishing the method or methods" of calculating reasonable, and therefore reimbursable, costs. 42 U.S.C. § 1395x(v)(1)(A);

42 C.F.R. § 413.9.  The CMS (known as the Health Care Financing Administration ("HCFA") until July 2001) administers this program on behalf of the Secretary.  Centers for Medicare & Medicaid Services; Statement of Organization, Functions and Delegations of Authority, Reorganization Order, 66 Fed. Reg. 35,437 (July 5, 2001).   Reimbursement for reasonable costs to providers is made through private "fiscal intermediaries" with which Medicare contracts.  42 U.S.C. §§ 1395h, 1395kk-1.  In addition to promulgating regulations, the Secretary issues manuals to assist healthcare providers and fiscal intermediaries in administering the system, such as the Provider Reimbursement Manual ("PRM") and the Medicare Intermediary Manual ("MIM").

In order to obtain a Medicare reimbursement, a health care provider files an annual cost report with its fiscal intermediary.  42 C.F.R. §§ 413.20(b), 413.24(f).  The intermediary then determines the amount of the reimbursement and issues a Notice of Amount of Program Reimbursement to the provider.  42 C.F.R. § 405.1803.  If a provider disagrees with the intermediary's determination, it may file an appeal with the PRRB.  42 U.S.C. § 1395oo; 42 C.F.R. § 405.1835.  The decision of the PRRB becomes the final administrative decision after sixty days unless the Secretary, through the Administrator, elects to review the decision within that time period.  42 U.S.C. § 1395oo(f)(1).  A provider may seek judicial review of the final decision of the PRRB or the Administrator in a federal district court.  42 U.S.C. § 1395oo(f)(1).

### B.  Depreciable Assets

The Medicare regulation governing claims for losses on depreciable assets provides that "[a]n appropriate allowance for depreciation on buildings and equipment used in the provision of patient care is an allowable cost" for which a provider may claim reimbursement.  42 C.F.R. § 413.134(a).  The annual depreciation for which the provider is reimbursed by Medicare is calculated by prorating the "historical cost" (i.e., the price the provider paid to acquire the asset) over the asset's estimated useful life.  42 C.F.R. §§ 413.134(a)(2), (a)(3), (b)(1).  As the

10

PRRB explained in this case, the CMS reimbursed providers annually "for a percentage of the yearly depreciation equal to the percentage the asset was used for the care of Medicare patients." App. at 69.[4] The historical cost of an asset, minus the annual recognized depreciation, is known as its "net book value." 42 C.F.R. § 413.134(b)(9).

The PRRB explained that because the net book value is based on estimates of the yearly depreciation, "the regulation at 42 C.F.R. § 413.134(f) provided for the determination of a depreciation adjustment where a provider incurred a gain or loss on the disposition [e.g., a sale] of a depreciable asset." App. at 69 (alteration added). As the Administrator noted,

> Basically, when there is a gain or loss, it means either that too much depreciation was recognized by the Medicare program resulting in a gain to be shared by Medicare, or insufficient depreciation was recognized by the Medicare program resulting in a loss to be shared by the Medicare program. An adjustment is made so that Medicare pays the actual cost the provider incurred in using the asset for patient care.

App. at 42.

### C. The Statutory Merger Provision

The Statutory Merger Provision of the regulation governing depreciable assets provides for a possible adjustment where assets are disposed of through a statutory merger, which is defined as: "[A] combination of two or more corporations under

---

[4] As the PRRB noted, "[a] depreciation adjustment for a gain or loss was removed from the [Medicare] program's regulations effective December 1, 1997." App. at 69 n.3; *see also* Medicare Program; Limit on the Valuation of a Depreciable Asset Recognized as an Allowance for Depreciation and Interest on Capital Indebtedness After a Change of Ownership, 63 Fed. Reg. 1379 (Jan. 9, 1998).

the corporation laws of the State, with one of the corporations surviving. The surviving corporation acquires the assets and liabilities of the merged corporation(s) by operation of State law." 42 C.F.R. § 413.134(k)(2).[5]

However, a statutory merger results in a Medicare gain or loss adjustment only if the merger was between "unrelated parties," as defined by 42 C.F.R. § 413.17. 42 C.F.R. § 413.134(k)(2)(i).[6] In addition, the Statutory Merger Provision states that if "the merged corporation was a [healthcare] provider before the merger, then it is subject to the provisions of paragraph[] . . . (f) of this section concerning recovery of accelerated depreciation and the realization of gains and losses." 42 C.F.R. § 413.134(k)(2)(i). It is the referenced provision of 42 C.F.R. § 413.134(f) that is at issue here. Section (f), the Bona Fide Sale Provision, covers gains and losses resulting from the disposition of depreciable assets through "sale, scrapping, trade-in, exchange, demolition, abandonment, condemnation, fire, theft, or other casualty." 42 C.F.R. § 413.134(f). At the time of the transaction in this case, a sale of assets that resulted in a gain or loss would trigger a Medicare adjustment only if it was a "bona fide sale." 42 C.F.R. § 413.134(f).[7]

The purpose behind both the Related Parties Regulation

---

[5] At the time of the Germantown merger, this subsection was designated as 42 C.F.R. § 413.134(*l*); in 2000 it was redesignated as subsection (k) without alteration to its content. Medicare Program; Payment Amount if Customary Charges are Less Than Reasonable Costs: Technical Amendments, 65 Fed. Reg. 8660 (Feb. 22, 2000) (codified at 42 C.F.R. § 413.134).

[6] According to CMS, this regulation originally contemplated only mergers between for-profit providers. *See* App. at 653.

[7] This regulation provides that adjustments for gains or losses are required with respect to the bona fide sale or scrapping of assets only if the assets were disposed of before December 1, 1997, 42 C.F.R. § 413.134(f)(2), and the merger in this case was effective September 1, 1997.

12

and the Bona Fide Sale Provision is to eliminate the potential for self-dealing and ensure that Medicare only reimburses providers for their actual costs. *See, e.g.*, *Monsour Med. Ctr.*, 806 F.2d at 1191 n.15 (discussing related parties); *Via Christi Reg'l Med. Ctr., Inc. v. Leavitt*, 509 F.3d 1259, 1262-63 (10th Cir. 2007) (discussing bona fide sale).

### D. Bona Fide Sale Provision

In May 2000, the Secretary amended the PRM with regard to the Bona Fide Sale Provision through a transmittal of changes to the PRM ("2000 PRM Amendment"):

> A bona fide sale contemplates an arm's length transaction between a willing and well informed buyer and seller, neither being under coercion, for reasonable consideration. An arm's-length transaction is a transaction negotiated by unrelated parties, each acting in its own self interest.

PRM § 104.24; App. at 649. This additional language was listed under the section of the transmittal setting forth changes "added to clarify existing instructions;" the agency did not list it as new material requiring an effective date. App. at 648.

Similarly, on October 19, 2000, the CMS issued a Program Memorandum on the "Clarification of the Application of the Regulations at 42 CFR 413.134(*l*)[8] to Mergers and Consolidations Involving Non-profit Providers" ("2000 PM"). App. at 653.[9] The 2000 PM notes that "non-profit organizations . . . associate or affiliate through mergers or consolidations for reasons that may differ from the traditional for-profit merger or consolidation." App. at 654. "Because there is no similar regulation specifically addressing mergers and consolidations between or among non-profit entities, we are clarifying the

---

[8] Now at 42 C.F.R. § 413.134(k).

[9] The 2000 PM expired in 2001. An identical PM was issued in 2001, but the parties refer to and cite the 2000 PM.

applicability of the [Bona Fide Sale Provision and Related Parties Regulation] sections to such mergers or consolidations." App. at 653.

With respect to the Bona Fide Sale Provision, the 2000 PM clearly stated that a merger must constitute a bona fide sale, noting:

> Unlike for-profit mergers or consolidations, which are typically driven by the ownership equity interests to seek fair market value for the assets involved in the transaction, many non-profit mergers and consolidations have only the interests of the community-at-large to drive the transaction.

App. at 655. The 2000 PM defined a bona fide sale as one negotiated at "arm's-length" between unrelated parties and involving "reasonable consideration." App. at 655. It continued that "a large disparity between the sales price (consideration) and the fair market value of the assets sold indicates the lack of a bona fide sale." App. at 655 (emphasis omitted).

Regarding its interpretations of both the Bona Fide Sale Provision and the Related Parties Regulation, the 2000 PM stressed that it was not establishing new rules: "This PM does not include any new policies regarding mergers or consolidations involving non-profit entities." App. at 656.

## IV.

## Discussion

The Administrator denied Einstein's claim because he concluded that the 1997 merger did not constitute a bona fide sale and because the merger occurred between related parties. Because either of these findings, if correct, was a sufficient independent basis on which to deny Einstein's claim, we will limit our focus to the bona fide sale issue. *See Robert F. Kennedy Med. Ctr. v. Leavitt*, 526 F.3d 557, 563 (9th Cir. 2008) (declining to reach the related parties issue because the bona fide

14

sale issue "is dispositive in this case").

## A. The Administrator's Regulatory Interpretation

Einstein argues that a merger is not a sale and, therefore, is not subject to the Bona Fide Sale Provision. In support of this argument, Einstein relies on a letter written by William Goeller in 1987 when he was HCFA's Director of the Division of Payment and Reporting Policy in the Office of Reimbursement Policy at the Bureau of Eligibility, Reimbursement and Coverage. This letter does not mention that a merger must be a bona fide sale and instead states that, "[f]or purposes of calculating the gain or loss, the amount of the assumed debt would be used as the amount received for the assets." App. at 129. The significance of this letter as support for Einstein's position is questionable as the letter also states that whether a gain or loss is recognized will be governed by 42 C.F.R. § 413.134(f), which encompasses the Bona Fide Sale Provision.

Einstein also relies on a letter from Charles R. Booth, another former agency official, and on the testimony of former HCFA officials, Michael Maher and Eric Yospe. *See* Appellant's Br. at 45-46. Citing our decision in *Mercy Home Health*, 436 F.3d at 378-79, the Secretary argues that "statements from former subordinate officials are not owed deference; instead, it is the Secretary's announced interpretation to which deference is due." Appellee's Br. at 49-50 n.14. Although *Mercy Home Health* does not stand for the proposition that statements of former officials are owed *no* deference, we agree with the Secretary to the extent that his "announced interpretation[s]" are owed greater deference.

We agree with Judge Buckwalter's analysis of the relationship between the Statutory Merger Provision and the Bona Fide Sale Provision as follows:

> [T]he Statutory Merger Regulation specifically references 42 C.F.R. § 413.134(f), stating, "If the merged corporation was a provider before the merger, then it is subject to the provisions of paragraphs (d)(3) and (f) of

15

this section concerning recovery of accelerated depreciation." 42 C.F.R. § 413.134[(k)(2)(i)]. A reasonable interpretation of this provision is that recognition of a loss resulting from a statutory merger is only permitted if otherwise allowed under paragraph (f). Under paragraph (f), the treatment of the gain or loss depends upon the manner of disposition of the asset. 42 C.F.R. § 413.134(f)(1). Paragraphs (f)(2) th[r]ough (f)(6) identify the specific means through which a depreciable asset can be disposed including, bona fide sale or scrapping; exchange, trade-in or donation; demolition or abandonment; or involuntary conversion. *Id.* at § 413.134(f)(2)-(f)(6). Of all the circumstances listed, the disposition most applicable to the present case is the bona fide sale requirement.

*Einstein*, 2007 WL 2221417, at *12. The Court concluded, therefore, that the Administrator's interpretation of the merger regulation to require that the transaction constitute a bona fide sale was reasonable.

In addition to arguing that the Bona Fide Sale Provision does not apply to mergers, Einstein argues that the Administrator's interpretation of this provision is inconsistent with prior agency statements. In its decision in this case, the Administrator, quoting the 2000 PRM, held that, "a bona fide sale contemplates an arm's length transaction between a willing and well-informed buyer and seller, neither being under coercion, for reasonable consideration. An arm's length transaction . . . is negotiated by unrelated parties, each acting in its own self-interest." App. at 62. Einstein, noting that this definition is found in the 2000 PRM Amendment and the 2000 PM, argues that this interpretation was impermissibly applied here because it was not articulated until after the 1996 merger at issue. Einstein, citing *Black's Law Dictionary*, argues that a "bona fide sale" is simply one in which "valuable consideration" is given. It argues, therefore, that any disparity between the fair market value of its assets and the amount of consideration it received from New Germantown (in the form of assumption of liabilities) is irrelevant.

16

The Secretary responds that 42 C.F.R. § 413.134(b)(2) requires that "a sale cannot be 'bona fide' if it is not an exchange for fair value."  Appellee's Br. at 31.  This regulatory provision defines "fair market value" as "the price that the asset would bring by bona fide bargaining between well-informed buyers and sellers at the date of acquisition."  42 C.F.R. § 413.134(b)(2).  We note that the regulation may not have the significance ascribed to it by the Secretary as it defines fair market value, not bona fide sale.  However, this regulation demonstrates the agency's understanding of a relationship between a bona fide sale and fair market value.

The Secretary argues that the agency "has looked to the reasonableness of consideration since long before the transaction at issue in this case."  Appellee's Br. at 31.  For example, in *Hosp. Affiliates Int'l., Inc. v. Schweiker*, Medicare denied reimbursement because a sale was not bona fide and held: "There is no evidence in the record that the purchase price bore any relation to the actual value of the property.  Without such evidence, no determination of the transaction's being bona fide is appropriate."  543 F. Supp. 1380, 1389 (D. Tenn. 1982) (emphasis omitted).  This case shows that, contrary to Einstein's contention, at least as early as 1982 the agency looked to the fair market value when conducting the bona fide sale inquiry.

Einstein points to decisions that it contends hold that sales were bona fide even though the consideration paid was less than the appraised value of the assets.  However, as the Secretary correctly notes, in each of those cases "the Board found that parties with adverse interests had negotiated at arm's length to arrive at reasonable consideration for the exchange." Appellee's Br. at 32 n.8 (citing *Vallejo Gen. Hosp. v. Bowen*, 851 F.2d 229, 232 (9th Cir. 1988); *Ashland Reg'l Med. Ctr. v. Blue Cross & Blue Shield Ass'n/Blue Cross & Blue Shield of W. Pa.*, 1998 Medicare & Medicaid Guide 57,577 (P.R.R.B. 1998); *Edgecombe Gen. Hosp. v. Blue Cross & Blue Shield Ass'n/Blue Cross & Blue Shield of N.C.*, 1993 Medicare & Medicaid Guide 37,394 (P.R.R.B. 1993); *Lac Qui Parle Hosp. of Madison, Inc. v. Blue Cross & Blue Shield Ass'n/Blue Cross & Blue Shield of Minn.*, 1995 Medicare & Medicaid Guide 44,473 (P.R.R.B.

17

1995)).  For instance, in *Vallejo Gen. Hosp. v. Bowen*, the Administrator considered the sale of an asset from one hospital to another and deemed the sale price to be the fair market value because "it is in the interest of both parties bargaining rationally at arm[']s-length to evaluate accurately the [assets]."  851 F.2d at 232.

Having considered these cases, we conclude that the agency's requirement that a bona fide sale be one in which "reasonable consideration" is exchanged is not inconsistent with the agency's previous statements.  The Tenth Circuit recently came to the same conclusion in *Via Christi Reg'l Med. Ctr.,* 509 F.3d 1259 (10th Cir. 2007).  It stated, "[e]ven if the Secretary further clarified the definition of 'bona fide sale' in interpretive materials issued after the consolidation in this case, [the hospital] was on notice that § 413.134(f) and its 'bona fide sale' requirement would be more than a nullity."  *Id.* at 1276; s*ee also Robert F. Kennedy Med. Ctr.*, 526 F.3d at 563 (upholding the Administrator's decision that a transfer of $50 million in assets for $30.5 million in "consideration" was not a "bona fide sale").

Moreover, requiring "reasonable consideration" is in keeping with the underlying and long-standing purpose of the Medicare Act, i.e., to reimburse for only actual and reasonable costs.  42 U.S.C. § 1395x(v)(1)(A).  For that reason, we conclude that an interpretation of the Bona Fide Sale Provision that would permit hospitals to sell their assets at less than reasonable value and, as a result, gain reimbursement for losses that do not reflect losses actually incurred would be impermissible as contrary to the Medicare statute.  Therefore, we hold that the 2000 PRM Amendment and the 2000 PM offered a clarification of the Bona Fide Sale Provision that was not inconsistent with previous agency policy.  It follows that the Administrator did not commit an error of law in applying the bona fide sale requirement to Einstein's claim.

### B.  Substantial Evidence Supported the Administrator's Decision

The Administrator's finding that the Old

Germantown/New Germantown merger was not a bona fide sale is supported by substantial evidence in the record. First, it does not appear that Old Germantown and AEHN negotiated at arm's length. Instead, the record shows that Old Germantown consistently acted with the well-being of the new entity in mind and had no incentive of its own to bargain for more. It negotiated for $6 million in "contingent consideration" from AEHN, which would only benefit New Germantown. App. at 64. Indeed, Ricci conceded in his testimony before the PRRB that Old Germantown never tried to get this $6 million as part of the sale price to Old Germantown. Moreover, Old Germantown was concerned with structuring the transaction in order to maximize Medicare reimbursement, a gain that would also benefit only New Germantown. In essence, the evidence showed that the motivation of Old Germantown's Board in negotiating with AEHN was not to maximize the consideration paid by AEHN but rather to assure the success of Old Germantown's mission in the future (i.e., delivering quality health services to its community). We do not suggest that there was anything inappropriate in such a motivation. Old Germantown's willingness to bargain for benefits that would only inure to New Germantown - while laudable with respect to its commitment to the community - shows that the parties did not negotiate the terms of this merger at arm's length.

Second, the Administrator's finding that New Germantown did not give reasonable consideration was supported by ample evidence. Einstein does not dispute that Old Germantown surrendered $72.4 million in assets for New Germantown's assumption of $34.2 million in debt and $6 million in contingent consideration, a discrepancy of approximately $32 million.[10] Einstein argues that Old

_____

[10] The District Court arrived at different figures, amounting to a discrepancy of $35.2 million. We refer to the Administrator's findings, which both parties cite in their briefs. *See* Appellant's Br. at 53-55; Appellee's Br. at 34-35. Einstein argues that the balance sheets do not reflect fair market value because they include unknown liabilities and because Old Germantown could not access

19

Germantown chose "'the best deal that was on the street at that time.'" Appellant's Reply Br. at 25 (quoting Ricci Testimony, App. at 693). However, the Administrator found that the PHS proposal could have resulted in a net gain of $27 million. Einstein now argues that the PHS offer actually would have resulted in a loss of $10 million because Old Germantown's total debt was $34 million, which it could not cover with its $18 million in non-endowment fund assets, and it could not access the $37.9 million in principal of the endowment funds to pay this debt. The Administrator rejected Einstein's current explanations because "these reasons were not on [their] face self-evident at the time of the proposal and in part are comprised of conjectures. Thus, they do not explain the Provider's failure to follow-up at that time on [PHS's] proposal. It does suggest that interests, other than monetary, were more primary to a successful deal for the Provider." App. at 64. The Administrator concluded that, at the very least, Old Germantown should have followed up with PHS to negotiate more favorable terms.

Einstein also argues that the consideration was reasonable because the almost $38 million in endowment funds "were . . . limited use assets and were not the equivalent of $38 million in cash that New Germantown could immediately use as necessary." Appellant's Br. at 55. That is admittedly so. However, as the Secretary points out, Einstein's own accountant (albeit not on this transaction) testified before the PRRB that approximately $37 million was the fair market value of the endowments. Even if the fair market value of these funds should have been discounted to adjust for the fact that they were limited-use, that adjustment could hardly make up for a discrepancy of $32 million.[11]

_____

the principal of the endowment funds. However, Einstein does not suggest alternate values for these assets that would make the discrepancy reasonable.

[11] Einstein also argues that New Germantown's assumption of unknown liabilities drove the sale price lower. Einstein points to liabilities incurred after the merger as proof. However, at the time of the Merger, Old Germantown warranted that it had no

In addition, Einstein argues that the "Secretary's argument that Old Germantown received no benefit in exchange for 'surrendering' its Medicare loss claim makes no sense because that would be the case in every merger," because all the assets (including a Medicare claim) pass, by operation of law, to the surviving entity. Appellant's Reply Br. at 22-23. That is an inadequate response to the point made by the Secretary. The merger between the two healthcare providers was structured to maximize Medicare reimbursement. There was nothing improper in that effort, but the Secretary was not obliged to accommodate that wish. Medicare determined how much it would owe Old Germantown by comparing the consideration received in the merger for the assets with the assets' net book value (i.e., their original purchase price, minus the actual recognized annual depreciation). The difference would determine whether Old Germantown received a loss or a gain. It therefore appears that the only reason that Old Germantown was able to claim a loss was because it sold its assets for far less than their value. Because Old Germantown was a non-profit organization - rather than a corporation with equity stake holders - it suffered no loss by selling its assets for less than their value. The Administrator could reasonably conclude that it was not a bona fide sale.

Therefore, because we conclude that the Administrator's interpretation of the Bona Fide Sale Provision was reasonable and his application of the rule to the Germantown merger was based on substantial evidence, we uphold the Administrator's denial of the loss claim on the ground that the merger did not in fact constitute a bona fide sale. Because this is an independent ground upon which the Administrator denied the claim, we need not address whether the parties were "related" within the meaning of 42 C.F.R. § 413.17, and decline to do so.

---

undisclosed material liabilities. Moreover, it is hard to imagine how an adjustment in price for this risk could account for such a large discrepancy between consideration given and the market value of the assets.

21

### C. Einstein's Other Arguments

Einstein makes numerous additional arguments, which the District Court succinctly characterized as follows: "Generally, Plaintiff is arguing that the Secretary's continuity of control and bona fide sale positions conflict with the Statutory Merger [Provision's] plain terms and/or prior interpretations, thus effectively resulting in a new regulation, which was issued contrary to numerous statutory safeguards." *Einstein*, 2007 WL 2221417, at *14. For instance, Einstein argues that the 2000 PM was a new rule that was a "'fundamental modification of a previous interpretation'" and, therefore, required formal notice and comment rulemaking under the APA. Appellants Br. at 66 (quoting *SBC Inc. v. FCC*, 414 F.3d 486, 498 (3d Cir. 2005)).

These arguments hinge on whether the 2000 PM (stating that mergers are subject to a "continuity of control test" and the Bona Fide Sale Provision) and the 2000 PRM Amendment (stating that a bona fide sale requires arm's length negotiation and reasonable consideration) are inconsistent with prior agency interpretations. Essentially, the arguments turn on whether these agency statements are legislative or interpretive rules. We have previously described the difference in this way:

> Legislative rules are subject to the notice and comment requirements of the APA because they work substantive changes in prior regulations or create new law, rights, or duties. [Interpretive] rules, on the other hand, seek only to interpret language already in properly issued regulations. . . . [Interpretive], or procedural, rules do not themselves shift the rights or interests of the parties, although they may change the way in which the parties present themselves to the agency. . . . [Interpretive] or procedural rules and statements of policy are exempted from the notice and comment requirement of the APA.

*SBC Inc.*, 414 F.3d at 497-98 (quotations and citations omitted).

After consideration of the parties' arguments, we conclude that the agency's interpretation of the Bona Fide Sale

Provision is consistent with previous agency statements and in keeping with the underlying policy of the Medicare Act. Moreover, these interpretations did not retroactively alter Einstein's legal rights or duties. As noted above, prior agency statements, such as those in the 1982 case of *Hosp. Affiliates Int'l*, 543 F. Supp. at 1389, put Old Germantown "on notice that § 413.134(f) and its 'bona fide sale' requirement would be more than a nullity." *Via Christi*, 509 F.3d at 1276. We hold that the 2000 PM and 2000 PRM Amendment are "interpretive rules" that did not require notice and comment rulemaking. Therefore, Einstein's arguments with respect to improper rulemaking are without merit.

## V.

## Conclusion

We will accordingly affirm the District Court order granting summary judgment in favor of the Secretary for the reasons set forth above.