**PROVENA HOSPITALS**

v.

**Kathleen SEBELIUS, as Secretary of Health and Human Service.**

**Civil Action No. WMN–08–1054.**

United States District Court,
District of Columbia.

Oct. 13, 2009.

---

Harold G. Belkowitz, Ober, Kaler, Grimes & Shriver, Washington, DC, for Plaintiff.

Joel L. McElvain, U.S. Department of Justice, Washington, DC, for Defendant.

### MEMORANDUM

WILLIAM M. NICKERSON, Senior District Judge.

This action arises out of the November 30, 1997, consolidation of three Illinois hospital systems. Plaintiff Provena Hospitals (Provena), the entity into which the three systems consolidated, brings this action as the successor-in-interest to Mercy Center for Health Care Services (Mercy Center), one of the consolidating entities. Provena challenges the decision of the Secretary of Health and Human Services (the Secretary) denying Mercy Center's reimbursement claims for approximately $4.5 million in depreciation-related losses that Provena asserts resulted from the consolidation. The Secretary denied Provena's claim for reimbursement on two grounds: (1) that the consolidation was not between "unrelated parties" as required under 42 C.F.R. § 413.134(k); and (2) that no "bona fide sale" occurred as required under 42 C.F.R. § 413.134(f).

Provena argues that the "related party" and "bona fide sale" policies used to deny Mercy Center's claim were adopted only after the 1997 consolidation and that it was impermissible for the Secretary to apply them retroactively. In the alternative, Provena argues that, even if those policies were in place when Provena was formed, the consolidation satisfied the requisite conditions. The parties have filed cross motions for summary judgment, Paper Nos. 15 (Provena's) and 16 (the Secretary's), and the motions are fully briefed and supplemented. Upon review of the pleadings and the applicable case law, the Court finds that the Secretary properly interpreted and applied the policy disqualifying from depreciation reimbursement consolidations that were not bona fide sales.[1] Accordingly, the decision of the Secretary will be affirmed.[2]

## I. GENERAL STATUTORY AND REGULATORY FRAMEWORK

Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395 et seq. (the Medicare Act) establishes a federally funded health insurance program for the aged and disabled. The Centers for Medicare and Medicaid Services (CMS)[3] administers the Medicare program on behalf of the Secretary, but the Secretary also contracts with private fiscal intermediaries to make the initial determination as to how much a Medicare provider should be reimbursed for services. See id. § 1395h. If the provider disagrees with the intermediary's reimbursement determination, it can appeal that decision to the Provider Reimbursement Review Board (PRRB). Id. § 1395oo (a). After sixty days, the decision of the PRRB becomes the final decision of the Secretary unless the Secretary, through the CMS Administrator, elects to review it within that time period. Id. § 1395oo (f)(1). A Medicare provider can seek judicial review of a final decision of the PRRB or the CMS Administrator in a federal district court. Id.

1. Because the Court's finding that the consolidation did not satisfy the "bona fide sale" requirement is dispositive, it need not reach the "related party" issue.

2. Although Provena has requested oral argument, the decision as to whether to hold oral argument on a motion is left to the Court's discretion and in this instance, the Court finds that oral argument is not necessary given the complete and comprehensive written submissions. See Local Civil Rule 7(f).

3. Until 2001, CMS was known as the Health Care Financing Administration (HCFA). See 66 Fed. Reg. 35437.

Under the Medicare Act, providers of Medicare services are entitled to be reimbursed for the "reasonable cost of [Medicare] services." *Id.* § 1395f(b)(1). The statute defines the "reasonable cost" of a service to be "the cost *actually incurred,* excluding therefore any part of incurred cost found to be unnecessary in the efficient delivery of needed health services." 42 U.S.C. § 1395x(v)(1)(A) (emphasis added). Furthermore, the reasonable cost is to be "determined in accordance with regulations establishing the method or methods to be used," as promulgated by the Secretary. *Id.* In addition to promulgating regulations, the Secretary also issues manuals, such as the Provider Reimbursement Manual (PRM) and the Medicare Intermediary Manual (MIM), to assist Medicare providers and fiscal intermediaries in administering the reimbursement system.

Of particular relevance here, the regulations in effect at the time of the 1997 consolidation stated that a provider could claim reimbursement for "[a]n appropriate allowance for depreciation on buildings and equipment used in the provision of patient care." 42 C.F.R. § 413.134(a). This allowance for depreciation was calculated by prorating "the cost incurred by the present owner in acquiring the asset" (its "historical cost") over the asset's "estimated useful life," and then estimating the percentage of the depreciation attributable to providing services to Medicare patients. *Id.* § 413.134(a)(3) and (b)(1). Providers were then reimbursed annually based upon this depreciation calculation.

In recognition of the fact that these annual payments might overstate or understate the true depreciation of the asset, Medicare regulations provided, under certain circumstances, for an adjustment to reconcile the previous annual depreciation payments with the asset's actual value upon the disposal of the depreciable asset. The principal Medicare regulation that addressed the depreciation of assets, 42 C.F.R. § 413.134, stated that the treatment of the gains or losses from a disposal of those assets "depends on the manner of disposition of the asset, as specified in paragraphs (f)(2) through (6) of this section." *Id.* § 413.134(f)(1). Subsection (f)(2), entitled "Bona fide sale or scrapping," provided that gains and losses realized from the bona fide sale of depreciable assets could be considered in calculating allowable costs.[4]

When allowable, this adjustment under paragraph (f) was based upon the difference between the "net book value" (*i.e.,* its initial depreciable basis minus subsequently recognized annual depreciation) and the consideration received for the asset at its disposal. If the consideration received was greater than the asset's net book value, then the provider realized a gain and was required to remit that difference to Medicare on the assumption that the annual allowances overstated the actual depreciation. If the consideration received was less than the asset's net book value, then the provider was deemed to have incurred a loss and received an additional depreciation reimbursement as a result of the disposition of the asset. If the Medicare provider sells multiple assets for a "lump sum sales price," the provider must allocate the price received among the assets sold, "in accordance with the fair market value of each asset." *Id.* § 413.134(f)(2)(iv). It must be remembered that the purpose of this adjustment upon disposal of an asset was to assure

---

**4.** Subsections (f)(3) through (f)(6) address methods of disposition of assets not relevant to the instant action.

that "Medicare pays the actual cost incurred in using the asset for patient care." *Via Christi Reg'l Med. Ctr. v. Leavitt,* 509 F.3d 1259, 1262 (10th Cir.2007).

Paragraph (k)[5] of § 413.134, which is at the center of this controversy, addressed three particular types of transactions: (1) the acquisition of a provider's capital stock; (2) a statutory merger; and (3) a consolidation. Although paragraph (k) was denominated as a provision related to "[t]ransactions involving a provider's capital stock," the Secretary has always interpreted it as applying in the non-profit sector as well, *Via Christi,* 509 F.3d at 1263 n. 4 and 1272 n. 12, and neither party disputes that the Secretary was correct in so doing. Under this paragraph, a consolidation was defined as a "combination of two or more corporations resulting in the creation of a new corporate entity." *Id.* § 413.134(k)(3). There is no dispute in this litigation that the formation of Provena was a consolidation within the meaning of this provision.

The portion of paragraph (k) addressing consolidations where at least one of the original entities was a Medicare provider, § 413.134(k)(3), draws a distinction between the treatment of consolidations involving "related" parties and those involving parties that are "unrelated." If the parties to the consolidation were unrelated, the regulation permitted the assets of the provider corporation(s) to be revalued. *Id.* § 413.134(k)(3)(i). If the consolidation was between two or more related corporations, no revaluation of provider assets was permitted. *Id.* § 413.134(k)(3)(ii).[6]

The portion of paragraph (k) related to statutory mergers contains a similar distinction between related and non-related entities. § 413.134(k)(2). As in the consolidation provision, no revaluation of assets was permitted if the merging entities were related. Unlike the provision addressing consolidations, however, the statutory merger provision goes on to state that "[i]f the merged corporation was a provider before the merger, then it is subject to the provisions of paragraphs (d)(3) and (f) of this section concerning recovery of accelerated depreciation and the realization of gains and losses." § 413.134(k)(2)(i). As discussed above, paragraph (f) provides that a depreciation adjustment is only allowed if a sale was a "bona fide sale." Although the consolidation provision, § 413.134(k)(3), does not contain a parallel reference to paragraph (f), the Secretary has interpreted it as containing a similar provision. *See infra.* The propriety of that interpretation is one of the central issues in this litigation.

One additional provision in the regulations is potentially relevant here. Under the "general rules" section of 42 C.F.R. § 413.134, the term "fair market value" is defined in terms of a "bona fide sale:"

Fair market value is the price that the asset would bring by bona fide bargaining between well-informed buyers and sellers at the date of acquisition. Usually the fair market price is the price that bona fide sales have been consummated for assets of like type, quality, and quantity in a particular market at the time of acquisition.

---

**5.** This paragraph had been designated as 42 C.F.R. 413.134(*l* ) prior to 2002. In this opinion, the Court will refer to it by its new designation.

**6.** Section 413.17 provides the definition of "related:" "Related to the provider means that the provider to a significant extent is associated or affiliated with or has control of or is controlled by the organization furnishing the services, facilities, or supplies."

42 C.F.R. § 413.134(b)(2). Here, the Secretary relies on this provision to incorporate a "fair market value" or "reasonable consideration" element into the requirement of a bona fide sale. This interpretation of the regulations is also a major issue in this litigation.

To understand the arguments put forth by Provena, some discussion of the historical development of Medicare policy related to depreciation and adjustments allowable on the disposal of depreciable assets is helpful. Medicare regulations issued in November 1966 first designated depreciation as an "allowable cost," and required that gains and losses from disposal of assets be included in the allowable cost determination. 31 Fed. Reg. 14,808, 14,810-11 (Nov. 22, 1966). The regulations, however, did not specify the procedures for calculating the gain or loss on disposal.

On January 19, 1979, the regulations were amended to address certain types of disposal of assets, including by "bona fide sale." 44 Fed. Reg. 3980, 3982-83 (Jan. 19, 1979). This amendment added what is now § 413.134(f), discussed above. Included in this amendment was the provision that, in the case of "lump sum sales," the sales price would be allocated to each asset according to its fair market value. 44 Fed. Reg. 3980, 3983. In issuing these amended regulations, the agency stated that they "are intended to assure that the depreciation allowed under Medicare accurately reflects providers' costs of using assets for patient care." 44 Fed. Reg. 3980.

On February 5, 1979, the regulations were amended again to add what is now paragraph (k) of § 413.134, including the consolidation provision discussed above. 44 Fed. Reg. 6912, 6915 (Feb. 5, 1979). When these amendments to the regulations were first proposed in 1977, the Secretary clarified that they were simply to describe the intention of existing programs regulations and principles when applied to "complex financial transactions." 42 Fed. Reg. 17485 (Apr. 1, 1977). "The proposed amendments are a specific interpretation of existing program policy based on previously promulgated regulations." *Id.*

The next development related to the recognition of gains or losses upon the disposal of a depreciable asset came not from the Secretary, but from Congress. On July 18, 1984, Congress enacted Section 2314(a)(ii) of the Deficit Reduction Act of 1984 ("DEFRA") (Pub. L. No. 98-369), which required Medicare regulations to "provide for recapture of depreciation in the same manner as provided under the regulations in effect on June 1, 1984." Although the language in DEFRA referred to "recapture of depreciation," courts, as well as the Secretary, have recognized that this provision applied both to transactions that result in a gain and to transactions that result in a loss. *See Lake Med. Center v. Thompson,* 243 F.3d 568 (D.C.Cir. 2001); 57 Fed. Reg. 43,906, 43,907 (Sept. 23, 1992).

In 1987, the Secretary issued two pronouncements relevant to the consolidation provision in § 413.134. In April 1987, the Secretary included an explanation in the MIM that "Medicare program policy permits a revaluation of assets affected by corporate consolidations between unrelated parties." AR at 4197-98, MIM, 04-87, § 4502.7. On May 11, 1987, William Goeller, Director of HCFA's Division of Payment and Reporting Policy of the Office of Reimbursement Policy, Bureau of Eligibility, Reimbursement and Coverage, responded to an inquiry concerning "the revaluation of assets and adjustments for gains and losses when two nonprofit hospitals merge or consolidate." Administrative Record (AR) 4413-14. Goeller explained that, notwithstanding 413.134(k)'s reference to capital stock, that provision

also governs mergers and consolidations of nonstock, nonprofit providers. He continued:

> If the transaction you have described meets the definition of either a statutory merger or consolidation as set forth in the regulations section ..., then a revaluation of assets and/or an adjustment to recognize realized gains and losses *may* occur.
>
> To determine whether a revaluation of assets or a gain/loss adjustment will occur, we must turn to the question of whether the assets will be donated or whether any consideration will be exchanged for the assets....
>
> [I]f the assets will be exchanged for consideration, a donation would not occur and the consideration given would be the acquisition cost of the assets to the new owner. In a situation where the surviving/new corporation assumes liability for outstanding debt of the merged/consolidated corporations, the assumed debt would be viewed as consideration given. Thus, in a merger or consolidation of nonstock, nonprofit corporations in which the surviving or new corporation assumes debt of the merged or consolidated corporations, ... an adjustment to recognize any gain or loss to the merged/consolidated corporations would be required *in accordance with regulations section 42 CFR 413.134(f)*. For purposes of calculating gain or loss, the amount of the assumed debt would be used as the amount received for the assets....

*Id.* (emphasis added).

On August 24, 1994, Charles Booth, the Director of the Office of Payment Policy, Bureau of Policy Development, sent a letter to counsel for a provider hospital responding to an inquiry about a potential consolidation under which Hospital C would acquire the assets of Hospitals A and B in exchange for the assumption of all liabilities of each organization. AR 4416–17. Booth replied that "based on our understanding of the transaction, [ ] it appears to be a consolidation as defined in § 413.134(k)(3)(i) requiring a determination of gain or loss *under § 413.134(f)*." *Id.* at 4416 (emphasis added). He went on to discuss the methodology to be used to apportion the sales price.

There is evidence in the record that, beginning in the 1990s, the dynamics of the health care industry changed such that change of ownership (CHOW) transactions began to generate significant losses where once they had generated gains. *See* AR 4237, 4249–51, June 1997 Report of Office of Inspector General, "Medical Losses on Hospital Sales" (1997 OIG Report). To address this issue, a "CHOW Workgroup" was convened for the purpose of "[reviewing] existing regulations and program manual provisions relating to provider changes in ownership for the purposes of making recommendations to HCFA [ ] to modify, update and expand program instructions considered necessary in order to provide current and complete guidance to fiscal intermediaries and providers, regarding proper treatment of change of ownership transactions to determine appropriate Medicare reimbursement." AR at 4280 (Sept. 30, 1996, letter forwarding CHOW Workgroup recommendations). The CHOW Workgroup's recommendations were passed on to the Office of the Inspector General (OIG) for Health and Human Services which issued its own report and recommendations. June 1997 OIG Report.

One of the recommendations coming out of the CHOW Workgroup and the OIG Report was for Congress to eliminate the restrictions it had put in place in 1984 with the passage of DEFRA and to allow the Secretary to change the Medicare re-

imbursement provisions related to the disposal of depreciable assets. Congress acted on that recommendation in the Balanced Budget Act of 1997. Pub. L. No. 105–33, § 4404(a), 111 Stat 251, 400 (1997). In response, the Secretary promulgated what is now 42 C.F.R. § 413.134(f)(1), which prohibits the recognition of gains or losses for sales or scrappings that take place on or after December 1, 1997. The consolidation at issue here, however, was consummated prior to that effect date, albeit by one day.

One of the other outcomes of the CHOW Workgroup was the issuance of an amendment to the PRM through a Transmittal of Changes dated May 2000 providing a definition of the "bona fide sale" requirement. AR 4714–16, Transmittal 415. Added to the PRM was § 104.24 which read, "A bona fide sale contemplates an arm's length transaction between a willing and well informed buyer and seller, neither being under coercion, for reasonable consideration. An arm's-length transaction is a transaction negotiated by unrelated parties, each acting in its own self interest." AR at 4716. This additional language was identified as being "added to clarify existing instructions," and thus, no effective date was deemed necessary. AR at 4714.

In a similar vein, HCFA issued a Program Memorandum on October 19, 2000, (the 2000 PM) which stated it was being issued "to clarify application of the regulations at 42 CFR 413.134[ (k) ] to mergers and consolidations involving non-profit providers." AR at 5421, PM A–00–76. The 2000 PM explained that non-profit organizations "differ in significant ways from for-profit organizations," in that they exist for reasons other than to provide goods and services for a profit, *inter alia,* and, as a result, these organizations may engage in mergers and consolidations for reasons that may differ from those of for-

profit organizations. AR at 5422. Because the regulations at 42 C.F.R 413.134(k) were written to address for-profit mergers and consolidations, "certain special considerations" must be regarded in applying that regulation section to non-profits. *Id.*

One of the differences identified between non-profits and for-profits is that, with non-profits, there is more often a continuation, in whole or part, of the composition of the management of the consolidating entities and that of the resulting consolidated entity. Where there is that continuation of management, the 2000 PM observed, no real change in control of the assets has occurred. For that reason, the 2000 PM stated that, where the board of the resulting entity includes a significant number of directors from the consolidating entities, the consolidation "can be deemed to be between related parties" and no gain or loss will be recognized, regardless of the fact that the consolidating entities were themselves unrelated before the transaction.

The 2000 PM also addressed the "bona fide sale" requirement of the regulations, making the unremarkable observation that, because many non-profit mergers and consolidations "have only the interest of the community-at-large" as opposed to interests related to ownership equity, these transactions "do not always involve engaging in a bona fide sale or seeking fair market value for the assets given." AR at 5424. The 2000 PM stated further,

[N]o gain or loss may be recognized for Medicare payment purposes unless the transfer of the assets resulted from a bona fide sale as required by regulation 413.134(f).... The regulations at 42 CFR 413.134[ (k)) ] ) do not permit recognition of a gain or loss resulting from the mere combining of multiple entities'

assets and liabilities without regard to whether a bona fide sale occurred.... [F]or Medicare payment purposes, a recognizable gain or loss resulting from a sale of depreciable assets arises after an arm's-length business transaction between a willing and well-informed buyer and seller. An arm's-length transaction is a transaction negotiated by unrelated parties, each acting in its own self interest in which objective value is defined after selfish bargaining.... As with for-profit entities, in evaluating whether a bona fide sale has occurred in the context of a merger or consolidation between or among non-profit entities, a comparison of the sales price with the fair market value of the assets acquired is a required aspect of such analysis. As set forth in PRM 104.24, reasonable consideration is a required element of a bona fide sale. Thus, a large disparity between the sales price (consideration) and the fair market value of the assets sold indicates the lack of a bona fide sale.

AR at 5424.

The 2000 PM concluded with the declaration that, because "[t]his PM does not include any new policies," it should be applied to all cost reports for which a final notice of program reimbursement has not been issued. *Id.* at 5425.

With that regulatory background and history in mind, the Court now turns to the particular transaction at issue in this litigation.

## II. FACTUAL AND PROCEDURAL BACKGROUND

Until November 1997, Mercy Center was a not-for-profit corporation that operated a hospital in Aurora, Illinois. Mercy Center's sole corporate member was Mercy Health Corporation (MHC). MHC was sponsored by the Sisters of Mercy of the Americas, a Catholic religious order. In early 1997, the Sisters of Mercy and two other Catholic orders that also operated acute care hospitals, Franciscan Sisters of the Sacred Heart and Servants of the Holy Heart of Mary, determined that it would be advantageous in terms of economies of scale, greater coordination of services, and other considerations for the three orders to consolidate their acute care hospital facilities. On July 3, 1997, the three orders entered into a Master Affiliation Agreement providing for the creation of a single Catholic-identified integrated healthcare and human services delivery system.

The consolidation occurred on November 30, 1997. On that date, the three corporations sponsored by the three religious orders merged to form a new entity, Provena, and surrendered all of their assets to that new entity. On that same date, Provena Health was created through amendment to the Articles of Incorporation of Mercy Center and Provena Health became the sole corporate member of Provena. Under Provena's by-laws, the Mercy Center board continued in existence as the local governing body for the hospital that had been operated by Mercy Center. Furthermore, the president of Mercy Center became the chief executive of Provena Hospitals.

As for the financial aspects of the consolidation, there are some minor disagreements in the pleadings. The Secretary asserts that Mercy Center received approximately $45.6 million for its assets in the form an assumption of all of Mercy Center's liabilities by Provena. Secretary's Opp'n at 11 (citing AR at 501, Mercy Center's June 30, 1997, Balance Sheet). In exchange, Provena received assets valued at $102.9 million, including $61.6 million in current assets and limited-use assets. *Id.* From these figures, the Secretary opines that Mercy Center

sold its depreciable assets for nothing, and its monetary assets at a steep discount. *Id.* at 22.

Relying on Mercy Center's Balance Sheet from November 1997, Provena avers that Mercy Center received approximately $43.7 million for its assets in the form of assumed liabilities. Provena's Mot. at 33 (citing AR at 4781). Provena further asserts that, of that compensation, more than $15 million was assigned to its fixed assets and more than $11 million to its depreciated assets (fixed assets excluding land). *Id.* Using this assignment of the compensation received and a net book value of Mercy Center's depreciable assets (excluding land) of about $36.5 million, Provena calculated a loss of over $25 million on depreciable assets from the consolidation, of which it designated over $4.5 million as a loss attributable to Medicare. AR at 4781.

Provena, acting as Mercy Center's successor-in-interest, submitted a cost report to its fiscal intermediary with a claim for approximately $4.5 million for loss on disposal of depreciated assets. The intermediary denied the claim and Provena appealed to the PRRB. The PRRB affirmed the denial of the claim on the ground that the consolidation was a "related party" transaction for which the recognition of a gain or loss is not permitted. AR at 41, PRRB Decision dated Feb. 15, 2008 (citing 42 C.F.R. § 413.134[ (k) ](3)(ii)). The CMS Administrator reviewed the decision of the PRRB and also affirmed the denial of the claim. AR at 2–26, Administrator's Decision dated April 15, 2008. The Administrator disallowed the claim on the ground that the consolidation was a related party transaction, AR at 18–24, but also on the ground that Mercy Center's transfer of assets to Provena did not satisfy the "bona fide sale" requirement which he concluded it must satisfy in order for Mercy Center to realize a loss on the transactions. *Id.* at

24–25. In addition to the absence of an arm's-length negotiation between unrelated parties, the Administrator found that there was no "reasonable consideration" transferred for the depreciable assets. *Id.* at 25.

Provena has sought judicial review of the Administrator's decision in this Court. The parties have submitted the Administrative Record from below and now both parties have moved for judgment.

## III. STANDARD OF REVIEW

This Court's review of the Secretary's decision is governed by the Administrative Procedures Act, 5 U.S.C. §§ 701 *et seq.* (APA). Under the APA, a court can set aside an agency's decision if it is "arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). In the context of a review of a Medicare reimbursement determination, the Supreme Court has observed that the reviewing court:

> must give substantial deference to an agency's interpretation of its own regulations. Our task is not to decide which among several competing interpretations best serves the regulatory purpose. Rather, the agency's interpretation must be given controlling weight unless it is plainly erroneous or inconsistent with the regulation. In other words, we must defer to the Secretary's interpretation unless an alternative reading is compelled by the regulation's plain language or by other indications of the Secretary's intent at the time of the regulation's promulgation. This broad deference is all the more warranted when, as here, the regulation concerns "a complex and highly technical regulatory program," in which the identification and classification of relevant "criteria necessarily require significant expertise and entail the exer-

cise of judgment grounded in policy concerns." *Thomas Jefferson Univ. v. Shalala,* 512 U.S. 504, 512, 114 S.Ct. 2381, 129 L.Ed.2d 405 (1994)(internal quotations and citations omitted).

■ Provena would add that to the standard of review that, " 'where the challenged decision stems from an administrative about-face,' " the review of the agency action must be " 'more demanding.' " Provena's Mot. at 10 (quoting *Greater Yellowstone Coal. v. Kempthorne,* 577 F.Supp.2d 183, 189 (D.D.C.2008)). "[I]t is true that an agency's interpretation of a statute or regulation that conflicts with a prior interpretation is entitled to considerably less deference than a consistently held agency view." *Thomas Jefferson Univ.,* 512 U.S. at 515, 114 S.Ct. 2381 (internal quotations omitted). Of course, this maxim would be inapplicable if it is shown that the Secretary's interpretations of the relevant regulations have been consistent. *Id.*

■ In reviewing the agency's application of its regulations to the facts of a particular case, the court must determine if the agency's decision is supported by "substantial evidence." 5 U.S.C. § 706(2)(E). Substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971).

## IV. DISCUSSION

As to the bona fide sale requirement, Provena makes four primary arguments:

(1) that the regulatory requirements for a bona fide sale do not apply to consolidations; (2) that, if the bona fide sale requirement does apply, the consolidation at issue satisfied the requirement in that it was a consolidation between unrelated entities which were at arm's length from one another; (3) that the bona fide sale requirement did not include the requirement that there be "reasonable consideration;" and (4) that, if a bona fide sale required reasonable consideration, the consolidation at issue satisfied that requirement as well. *See* Mot. at 24. Perhaps the single focal point, however, of Provena's challenge is its contention that, in denying the claim, the Secretary has retroactively applied to this 1997 consolidation an interpretation of the regulations that was not announced until the issuance of the 2000 PM.

■ The Court would first observe that all of the arguments Provena now advances regarding the Secretary's alleged "about-face" have been flatly rejected by every court that has considered them. *See Via Christi,* 509 F.3d at 1274 (holding that "in order for consolidating Medicare providers to obtain reimbursement for a depreciation adjustment, the consolidation must meet the "bona fide sale" requirements of 42 C.F.R. § 413.134(f)")[7]; *Sewickley Valley Hosp. v. Sebelius,* 337 Fed. Appx. 167 (3rd Cir.2009) (same); *Albert Einstein Med. Ctr. v. Sebelius,* 566 F.3d 368 (3rd Cir.2009) (holding that the 2000 PRM amendment and the 2000 PM offered a "clarification of the Bona Fide Sale Provision that was not inconsistent with previous agency policy" and it was not an error to apply that provision to a claim arising from a 1997 statutory merger); *Robert F. Kennedy Med. Ctr. v. Leavitt,* 526 F.3d

---

**7.** While affirming the Secretary's denial of the provider's claim on the ground that the consolidation did not satisfy the bona fide sale requirement, the Tenth Circuit in *Via Christi* rejected the Secretary's interpretation of the "related party" requirement. 509 F.3d at 1272–74.

557 (9th Cir.2008) (following *Via Christi* and applying bona fide sale and "reasonable consideration" requirement to 1996 statutory merger).[8] Providers challenging the Secretary's interpretation in many of these cases mount their challenges on much of the same regulatory history as Provena relies on here.[9] The Court notes that the evidence Provena presents here in arguing that the consolidation satisfied the bona fide sale and reasonable consideration requirements is also similar to, and just as unpersuasive as, the evidence presented in these other actions.

In *Via Christi*, the Tenth Circuit reached the ultimate conclusion that "the 'bona fide sale' requirement is a reasonable construction of 42 C.F.R. § 413.134[ (k) ](3)(i), supported by the text of the regulations." 509 F.3d at 1274. The court began with the observation that, "[s]ection 413.134(f) is the *only* section expressly permitting depreciation adjustments and defining the exact circumstances under which a provider can seek such an adjustment." *Id.* (emphasis in original). Thus, if the Secretary is to construe § 413.134(k)(3)(i) as permitting depreciation adjustments after consolidations, it is reasonable for the Secretary to only allow depreciation adjustments for transactions that comply with § 413.134(f). *Id.* at 1274–75. The court opines that it also would have been reasonable for the Secretary to have interpreted "the plain language of § 413.134[ (k) ] as precluding

*any* adjustment to depreciation payments." *Id.* at 1274 n. 13.

Once the Secretary determined to allow a depreciation adjustment under § 413.134(f) for a consolidation, the *Via Christi* court reasoned, the only disposal of depreciable assets identified in section (f) that could even potentially apply is the "bona fide sale" provision. *Id.* at 1275. Again, the court opined that the Secretary could have reasonably concluded, as Provena argues here, that consolidations simply are not the same as sales. The result of that conclusion, however, would be that Provena would automatically lose its claim as a consolidation would satisfy none of the other provisions of § 413.134(f) permitting a depreciation adjustment. *See id.* at 1275 n. 14.

In the final step of its evaluation of the Secretary's interpretation of the regulations, the *Via Christi* court concluded that the Secretary's inclusion in the definition of "bona fide sale" "(1) arm's length bargaining, [including] an attempt to maximize any sale price, and (2) reasonable consideration" was a reasonable interpretation and was entitled to deference. *Id.* at 1275. In reaching this conclusion, the court relied on the relationship between "fair market value" and "bona fide" established elsewhere in § 413.134, specifically in the definition of "fair market value" as "the price that the asset would bring by bona fide bargaining between well-informed buyers and sellers at the date of acquisition." § 413.134(b)(2). This Court would

**8.** See also, *Lehigh Valley Hosp.-Muhlenberg v. Leavitt,* 253 Fed.Appx. 190, 194–95 (3rd Cir. 2007) (applying bona fide sale/reasonable consideration requirement to 1997 statutory merger); *St. Luke's Hosp. v. Sebelius,* 662 F.Supp.2d 99 (D.D.C.2009); *UPMC–Braddock Hosp. v. Leavitt,* No. 07–1618, 2008 WL 4442056 (W.D.Pa. Sept. 29, 2008) (same); *North Iowa Med. Ctr. v. Dept. of Health & Human Servs.,* 196 F.Supp.2d 784, 787

(N.D.Iowa 2002) (stating that "[u]nder 42 C.F.R. § 413.134(f), a sale of depreciable assets is bona fide if (a) fair market value is paid for the assets, and (b) the sale is negotiated (i) at arms' length (ii) between unrelated parties")

**9.** That is not surprising as the law firm representing Provena in this action is the same firm representing the providers in several of these other actions.

add that, as the whole purpose of the depreciation adjustment regulations was to assure that the depreciation allowed "accurately reflects" the providers' true costs of using assets for patient care, 44 Fed. Reg. 3980, *supra*, only a methodology that includes a means of determining the fair market value of the assets at the time of the consolidation could serve that purpose.

The *Via Christi* court found no direct inconsistencies between this understanding of the regulations and the prior interpretive materials which are cited by Provena in this action. Nor does this Court. For example, while the 1987 Goeller letter cited by Provena and the provider in *Via Christi* stated that "a revaluation of assets and/or an adjustment to recognize realized gains and losses *may* occur" when nonprofit providers consolidate, it also specifically stated that any adjustment to recognize a gain or loss to the merged/consolidated corporations would be "*in accordance with regulations section 42 CFR 413.134(f).*" AR 4413–14 (emphasis added). Similarly, the 1994 Booth letter discusses how gains or losses would be computed if they were to be recognized. The letter expressly stated, however, that the "determination of gain or loss" would be made "under § 413.134(f)." AR at 4416. Contrary to Provena's contentions, there simply has not been a definitive interpretive statement declaring that the bona fide sale and reasonable consideration requirement would not apply to the recognition of gains or losses on depreciable assets in a consolidation.

Furthermore, the Secretary provides reference to a decision issued long before the consolidation at issue here in which the Secretary and the district court reviewing the agency's decision took the position that the concept of bona fide sale included the receipt of reasonable consideration. Secretary's Mot. at 20 (citing *Hospital Affili-*

*ates Int'l, Inc. v. Schweiker,* 543 F.Supp. 1380 (D.Tenn.1982)). In *Hospital Affiliates,* the PRRB denied a loss on depreciable assets claim arising from the sale of a hospital to a non-profit. The PRRB denied the claim, and the district court affirmed that decision, on the ground that the transaction was between related parties. The court went on, however, to note that "the present case could not be found to involve a bona fide transaction on this record. There is no evidence in the record that the purchase price bore any relation to the actual value of the property. Without such evidence, no determination of the transaction's being bona fide is appropriate." 543 F.Supp. 1380.

In contrast to the reasonableness of the Secretary's interpretation, Provena's would allow a provider to recognize a loss on a consolidation whenever the liabilities assumed are less than the net book value, regardless of whether the provider actually experienced a true loss. In a somewhat half-hearted attempt to rationalize its position, Provena declares that "there is *frequently* a direct relationship between hospital assets and liabilities," because when hospitals borrow for capital projects, those projects add to the value of the hospital's assets. Provena's Reply at 8 n. 2 (emphasis added). Of interest, the Court notes that the firm representing Provena in this action acknowledged in a similar action recently decided by Judge Robertson, that it would be "mere happenstance" if the fair market value of the merged entity's assets were to be equal to the assumed liabilities. *St. Luke's,* 662 F.Supp.2d at 103 (quoting Pl.'s Mot. at 19). This Court is inclined to agree with the "mere happenstance" assessment and Provena provides no evidence to support its current conjecture. Regardless, whether it is by "happenstance" or "frequently," it would be an odd result that the regulation would automatically base a loss calculation on a "price"

with no more certain relationship to actual value. It would be particularly odd given that the whole purpose of the depreciation adjustment provision was to provide a more accurate assessment of the costs "actually incurred" in providing Medicare services than that provided by the net book value.

For all these reasons, the Court finds that the Secretary's interpretation of the regulations is entitled to deference.

■ The Court also finds that there was substantial evidence supporting the Administrator's determination under that interpretation that the consolidation at issue was not a bona fide sale. There is no evidence that the 1997 consolidation was an "arm's length" transaction. As clarified in the 2000 PM, an arm's length transaction is "a transaction negotiated by unrelated parties, each acting in its own self interest in which objective value is defined after selfish bargaining." AR at 5424. While Provena argues at length that the three Catholic health care systems were unrelated prior to the consolidation, there is no evidence that they bargained or negotiated over the sales price for Mercy Center's assets. This is not at all surprising given the expressed purpose of the consolidation, as set forth in the Master Affiliation Agreement signed on July 3, 1997.

In that Agreement, Mercy Center and the other two consolidating hospital systems stated that their goal was "to effect a commonality of ownership and control between [the consolidating systems] which will permit an integrated Affiliation of their respective organization ... into a single Catholic-identified integrated

healthcare and human services delivery system." AR at 5018. The Agreement described the "driving force behind the transactions" as "the strengthening and preservation of the Catholic healthcare ministry of the Sponsor Parties and their respective System Parties, together with their mutual desire to create a new form of equal co-sponsorship of the system." *Id.* at 5018–19. The Agreement also noted that the terms of the transactions and the resulting system "will allow the Sponsor Parties to retain their separate historical identities, unique traditions and constituencies while combining their healthcare ministries and preserving their local philanthropic support and protecting their donor-restricted endowments." *Id.* at 5020.

Given the nature of the institutions involved, these are certainly appropriate reasons for entering into the transaction and are certainly worthy goals. They plainly are not, however, indicia of an arm's length transaction. These expressed reasons for entering into the consolidation also explain why Mercy Center made no efforts to find another purchaser, nor did it even obtain an appraisal of its assets prior to the consolidation to determine what their value might be.

The Court also finds that there was substantial evidence in support of the determination that Mercy Center did not receive reasonable consideration for its assets. An appraisal of Mercy Center's fixed and intangible assets that was undertaken after the consolidation, in March of 1998, determined that the fair market value of Mercy Center's fixed and intangible assets at the time of the consolidation was $38,470,000.[10] In addition, at the time of

---

**10.** The Secretary represents the value of these assets as $42.2 million. Secretary's Mot. at 32 (citing AR at 4783–86). Provena contests this figure, arguing that the $42.2 million figure included the value of two medical of-

fice buildings that were owned, not by Mercy Center, but by one of its sister corporations. Provena's Reply at 12 n. 5 (citing AR at 438, Tr. of PRRB Hearing and AR at 4785, March 3, 1998 Appraisal Report).

the consolidation, Mercy Center had monetary assets valued at approximately $61.6 million, including almost $33.3 million in current assets. Thus, Provena received assets valued at over $100 million in exchange for assuming just $45.6 million of Mercy Center's liabilities. Courts have consistently found that discrepancies of this scale demonstrate the absence of a bona fide sale. *See, e.g., Lehigh Valley Hosp.-Muhlenberg,* 253 Fed.Appx. at 197 (holding that assumption of liabilities of $43.7 million for hospital's assets valued at over $100 million did not constitute a bona fide sale); *Robert F. Kennedy Med. Ctr.,* 526 F.3d at 563 (holding transaction lacked "reasonable consideration" where approximately $50 million in assets were transferred for the assumption of $30.5 in liabilities).

To avoid that finding here, Provena argues that it also assumed contingent liabilities of Mercy Center that should have been factored into the price paid for Mercy Center's assets. Provena's Mot. at 34. The Secretary notes that Provena made no effort to prove the value of these contingent liabilities during the administrative proceedings, and there is certainly no record that these liabilities were considered in structuring the transaction. Courts have consistently rejected similar arguments based upon the existence of "contingent liabilities." *See, e.g., Via Christi,* 509 F.3d at 1277 n. 16 (noting that where parties' due diligence before consolidation considered these risks acceptably low, provider could not, in arguing it received reasonable consideration, "make a mountain out of what it previously determined to be a molehill"); *Albert Einstein Med. Ctr.,* 566 F.3d at 379 n. 11 (rejecting argument that assumption of unknown liabilities drove the sale price lower, opining that it is "hard to imagine how an adjustment in price for this risk could account for" a $32 million discrepancy).

Provena raises a number of additional challenges to the Secretary's determination that can be addressed collectively. Provena argues: (1) that the Administrator's decision was arbitrary and capricious because it relied on a change in policy set forth in the 2000 PM without a rational explanation for that change in policy, Provena's Mot. at 35–37; (2) that the May 2000 amendment of the PRM and 2000 PM effected "significant change in Medicare program policy" and thus violated the restrictions put in place under DEFRA, *id.* at 37–38; (3) that the Administrator's determination represented an impermissible retroactive imposition of a new interpretive rule on a regulated party, *id.* at 38–39; (4) that the 2000 PM "added substantive context—new requirements" to the consolidation regulations and "represent[ed] a significant departure from long established and consistent practice" and thus, was subject to the APA's notice and comment requirements, with which the Secretary failed to comply, *id.* at 39–41; (5) that the Secretary failed to timely include the 2000 PM in the mandatory list of agency issuances published in the Federal Register under 42 U.S.C. § 1395hh(c)(1), and thus, the policies set forth in the 2000 PM could not be used to deny Provena's claim, *id.* at 41; and (6) that the 2000 PM represented the announcement of a "major rule" under the Congressional Review of Agency Rule Making Act ("CRA") and, as such, had to be submitted to Congress before being put into effect and, because it was not, it is unenforceable. *Id.* at 42–44.

Each of these arguments, however, is premised on Provena's assertion that the Secretary had previously committed to a position that reimbursements for "losses" could be realized on consolidations without regard to whether any true loss occurred. Because the Court rejects that premise,

Provena's additional arguments fail.[11]

## V. CONCLUSION

For all these reasons, the Court finds that the Secretary's denial of Provena's claim should be upheld. Accordingly, the Secretary's motion for summary judgment will be granted and Provena's motion for summary judgment denied. A separate order will issue.

---

11. Some of these arguments fail for additional reasons as well. For example, Provena's CRA claim also fails because the statute expressly states that "[n]o determination, finding, action, or omission under this chapter shall be subject to judicial review." 5 U.S.C. § 805. *See Montanans for Multiple Use v. Barbouletos,* 568 F.3d 225, 229 (D.C.Cir.2009) (holding that this provision denies courts the power to void rules on the basis of agency noncompliance with the CRA).